**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **COALITION FOR GOOD GOVERNANCE, RHONDA J. MARTIN, JEANNE DUFORT, AILEEN NAKAMURA, B. JOY WASSON, AND ELIZABETH THROOP,**<br><br>　　　　　**Plaintiffs,**<br>**v.**<br><br>**BRAD RAFFENSPERGER, in his official capacity as the SECRETARY OF STATE of the STATE OF GEORGIA, and REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN and AHN LE, in their official capacities as members of the Georgia State Election Board,**<br><br>　　　　　**Defendants.** | **Civil Action File No.** |

## **COMPLAINT**

Plaintiffs Coalition for Good Governance ("Coalition"), Rhonda J. Martin,

Jeanne Dufort, Aileen Nakamura, B. Joy Wasson, and Elizabeth Throop bring this

civil rights action under 42 U.S.C. § 1983 for immediate and permanent

prospective injunctive and declaratory relief against the State of Georgia's

Secretary of State, Brad Raffensperger, and State Election Board Members

Page 1

Rebecca N. Sullivan, David J. Worley, Matthew Mashburn and Ahn Le, all in their official capacities.

## I.   INTRODUCTION AND SUMMARY

1.

This lawsuit seeks immediate changes to the State of Georgia's in-person and absentee mail ballot voting systems and procedures to protect the right to vote during the COVID-19 pandemic, including a three-week postponement of the June 9, 2020 election to June 30, 2020.  These changes must be put in place now, both to protect the June and August elections and also to anticipate the November 2020 general election.  Only by acting now can the Defendants assure the orderly conduct of upcoming elections without disenfranchising citizens.

2.

The COVID-19 pandemic continues to ravage the State and the Nation.  As of April 20, a reported 733 Georgians have died of the disease, 181 in just the previous five days.  Another 3,550 have been hospitalized – many in serious condition fighting for their lives.  Over 18,947 Georgians have tested positive for COVID-19, but because Georgia has only tested a small fraction of citizens, the actual number of infected citizens is likely many times more.

3.

According to projections, pandemic conditions in Georgia will continue throughout the period in which Georgia will be preparing for and conducting the June 9 election.  Based on its current projections, the Institute for Health Metrics and Evaluations at the University of Washington warns that it will not be safe to relax social distancing in Georgia until after June 15, 2020, and even then only if Georgia has containment strategies in place, such as testing, contact tracing, isolation, and contained limitations on the size of gatherings.

4.

 The Nation recently watched in despair as all branches of government in Wisconsin failed to take action under similar circumstances to address the impact that the pandemic was having upon the election there.  As a result, Wisconsin voters' constitutional rights were violated and the legitimacy of the election undermined.   Unless injunctive relief is granted immediately, Georgia citizens will find themselves in the same position as Wisconsin citizens: unable to vote in person without exposing themselves to the virus; unable to vote absentee by mail because the State has not planned for and is not equipped to accurately process and count the anticipated deluge of absentee mail ballots.

5.

Georgia voters must not be forced to choose between their own personal safety and exercising their fundamental right to vote, as were voters in Wisconsin. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Inherent in the right to vote freely is the right to vote without risking health and safety, particularly where appropriately tailored election procedures can eliminate or substantially mitigate such risks. Defendants, therefore, have the affirmative obligation to take all steps necessary to ensure that every Georgia citizen qualified to vote may vote in-person or by mail ballot without being forced to expose himself or herself to unnecessary risks of contracting or spreading COVID-19.

6.

In response to the pandemic, federal, state, county, and local officials have undertaken measures to slow the spread of the coronavirus, including school and business closures, mandated social distancing, and orders to shelter-in-place.

The central purposes of these protective measures are to limit contact between persons and to minimize exposure to surfaces that may be contaminated with the coronavirus.

7.

Almost everything that is typically required to be done to prepare for and conduct elections is at odds with social distancing and minizing contact with contaminated objects and surfaces.  In-person voting by its very nature features large numbers of people in close contact with each other with a high degree of interpersonal interaction.  In-person voting as it is currently conducted in Georgia requires voters and approximately 8,000 pollworkers to touch commonly used physical objects and surfaces which, under the circumstances of a public election, are almost certain to become contaminated by the virus that spreads this highly contagious disease.  There is no effective way to keep these objections and surfaces clean.  Pollworkers themselves are particularly vulnerable because they are often over 70 years old, are forced into close contact with each other and numerous voters, and must touch many surfaces and objects that will almost certainly become contaminated with the virus.

8.

Unless in-person voting is carefully planned, regulated, and diligently managed, and unless significant changes are made to how people vote in Georgia, voting in Georgia will remain dangerous to voters and pollworkers for the foreseeable future. If voting remains dangerous, voters will be forced to choose between their personal safety and exercising their fundamental right to vote. Those who do choose to vote will be severely burdened by the risk to their personal health that must be paid as a sort of "poll tax" for exercising their right to do so.

9.

In addition, if election officials are unable to recruit a sufficient number of pollworkers prepared to take the risk of such conditions, there is a great danger that the State will disenfranchise voters by improperly and hastily closing poll locations, limiting early voting, creating long lines, or limiting the hours during which people may vote. Without new controls and system transparency, mail ballot voting in volumes never before experienced in Georgia will result in lost or delayed applications and ballots and in improperly rejected or accepted ballots. Further, unless voting is widely perceived to be safe well in advance of the election, there are myriad ways that the vote will be suppressed or manipulated by

those who will take advantage of the pandemic, or the confusion created by the pandemic, for unfair political gain.

10.

The integrity and legitimacy of the upcoming elections will not be maintained if the protection of constitutional rights is left to the State — other than postponing the elections to June 9, none of the General Assembly, the Governor, the Secretary of State, and the State Election Board has taken any meaningful action to protect the health of the election officials, pollworkers, and voters who will participate in upcoming elections.  (The Secretary did mail absentee ballot applications to all Georgia registered voters, but incorrectly mailed 625,000 of the applications to the voters' residential addresses, instead of their mailing addresses.)

11.

Plaintiffs bring this action to compel the Defendants to take immediate action to ensure that Plaintiffs' rights to vote and to receive equal protection are not violated by the failure of the State to address the dangers presented by the pandemic.  Plaintiffs seek an order requiring a three-week postponement of the June 9 election to June 30, coupled with a number of operational changes necessary to ensure that public health is better during the conduct of the election.

With respect to in-person voting, Plaintiffs seek an order requiring the replacement of touchscreen ballot marking devices with simple hand marked paper ballots and disposable pens, as well as certain other measures to give local officials options to provide more flexible and safer voting conditions. With respect to absentee mail ballot voting, the Plaintiffs seek an order requiring the Defendants to take steps to make it more practical for voters to receive and to cast absentee mail ballots and to ensure that all eligible mail ballots are properly counted, and ballots proven to be ineligible are rejected. Plaintiffs also seek to require safer working conditions for in-person and absentee mail ballot election workers, thus enabling counties to recruit such workers in sufficient numbers to staff upcoming elections adequately while also reducing the risk of transmission of disease.

12.

Separately, Plaintiffs also seek relief relating to three improper actions that the Secretary has already taken during the pandemic: first, to reverse his position and count all valid absentee ballots received before by June 9, 2020; second, to correct the information on voters' My Voter Page to accurately reflect status of absentee ballot applications and ballots; third, to require the Secretary to mail

approximately 625,000 absentee ballot applications to the correct mailing addresses.

## II.    JURISDICTION AND VENUE

13.

This Court has subject-matter jurisdiction over each of the claims raised in this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), § 1343 (jurisdiction over civil rights actions), § 1367 (supplemental jurisdiction), § 2201 (jurisdiction to grant declaratory relief) and § 2202 (jurisdiction to grant relief ancillary to declaratory judgment).

14.

Venue lies in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) because some of the offices of the Defendants are in Fulton County and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred and are threatened to occur in this judicial district.

## III.   PARTIES

### A.    Plaintiffs

15.

Plaintiff Coalition for Good Governance ("Coalition") is a non-profit corporation organized and existing under the laws of the State of Colorado. (Other information about Coalition, its Georgia membership, and the other Plaintiffs, including their standing, is set forth in Part X, below).

16.

Plaintiff Rhonda Martin is a member and director of Coalition. Ms. Martin is a registered voter in Fulton County, State of Georgia, who intends to vote in upcoming elections.

17.

 Plaintiff Jeanne Dufort is a member of Coalition and registered voter in Morgan County, State of Georgia, who intends to vote in upcoming elections.

18.

Aileen Nakamura is a member of Coalition and a registered voter in Fulton County, State of Georgia, who intends to vote in-person in upcoming elections.

19.

B. Joy Wasson is a member of Coalition and a registered voter in DeKalb County, State of Georgia, who intends to vote in upcoming elections.

20.

Elizabeth Throop is a member of Coalition and a registered voter in DeKalb County, State of Georgia, who intends to vote in upcoming elections.

**B.     DEFENDANTS**

21.

Defendant Brad Raffensperger is sued for prospective declaratory and injunctive relief in his official capacity as the Secretary of State of Georgia. Secretary Raffensperger is also the Chairman of the State Election Board, which is responsible for the promulgation of election rules and regulations. Secretary Raffensperger has the authority to call the State Election Board into session for the consideration and adoption of emergency or permanent election rules.

22.

Secretary Raffensperger is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the law

or laws at issue in the suit," *Grizzle v. Kemp,* 634 F.3d 1314, 1319 (11th Cir. 2011), specifically the election laws in the State of Georgia.

23.

State Election Board Members Rebecca N. Sullivan, David J. Worley, Matthew Mashburn and Ahn Le (together with the Secretary, the "State Board Members") are also sued in their official capacities.  Acting through the State Board, the State Board Members collectively have the duty to promulgate rules and regulations to obtain uniformity in election practices, as well as the legality and purity of all primaries and elections, O.C.G.A. § 21-2-31(1), and to formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections. O.C.G.A. § 21-2-31(2).

## IV.   FACTS COMMON TO ALL COUNTS

### A.   Government Responses to the Pandemic

24.

The first American died of COVID-19 on February 29, 2020, in Washington State.  Two weeks later, on March 13, 2020, President Trump issued national emergency declarations.  Governor Kemp declared a state emergency on March 14

and, on April 8, extended it to May 13. These declarations came weeks after individual jurisdictions had closed schools or imposed local "shelter in place" regulations.

25.

Though the particular measures and regulations relating to the pandemic differ from jurisdiction to jurisdiction, in general these measures include the following requirements:

- Prohibition on public gatherings of more than 10 people;

- Closure of all non-essential businesses and organizations;

- Closure of all schools, colleges and universities;

- Closure of restaurants for in-restaurant service;

- "Shelter in place" regulations requiring people to stay at home;

- Social distancing requirements or recommendations for individuals to stay at least six feet apart;

- The need for individuals to wear protective masks in public.

**B.     The State Is Failing to Responsibly Address the Impact of the COVID-19 Pandemic Upon Elections**

26.

The June 9 election currently includes the originally scheduled March 24 Presidential Primary, a small number of originally scheduled March 24 special elections, the statewide primaries for state and county offices originally scheduled for May 19, and other special elections such as state office vacancy elections called recently such as State Senate District 4.

27.

On March 14, the Secretary postponed the March 24, 2020 presidential primary from March 24 to May 19, citing his authority under O.C.G.A § 21-2-50.1 to do so.  Early voting was announced to begin April 27, with voting system programming and public voting system testing to take place in early April.  It soon became obvious that postponing the Election Day only to May 19 was inadequate as County officials could not open offices or recruit pollworkers. Additionally, the Secretary had missed hard deadlines for building the May 19 ballots so that counties could proof and release them for timely printing.  For weeks, the Secretary resisted calls to postpone the election again, including from the Speaker of the House of the Georgia General Assembly, taking the position that he had no

authority to do so.  As the Speaker explained, the Secretary's position that he had

no legal authority to postpone the election again was incorrect.

28.

On April 9, the Secretary announced a postponement of the May 19

elections for three weeks, to June 9.  As explained in greater detail below, given

the ongoing pandemic, and the continuing difficulty of recruiting pollworkers, the

Secretary should have postponed the election until at least June 30.

29.

Though early voting for the June 9, 2020 election will begin on May 18 with

staff-intensive preparations beginning approximately May 4, the Secretary has

made little effort to address what essential changes to elections are necessary to

make it safe for voters, election officials, and pollworkers to participate in the

upcoming elections that are to be held during the pandemic.

30.

The Secretary has also not responded to urgent requests to address the

impact of the pandemic on Georgia's elections.  On March 23, Coalition wrote the

Secretary copying the State Board describing in detail necessary reforms that are

similar to those addressed in this Complaint.  (*See* Exhibit A). The Secretary has not acknowledged or responded to this letter.

31.

The Secretary also has completely failed to address the singular danger to public health that is posed by the State's new touchscreen ballot marking devices (BMDs).  The coronavirus will survive on the surfaces of touchscreen BMDs for days, and using the BMDs for in-person voting will obviously enable the transmission of the COVID-19 virus.

32.

On April 6, 2020, concerned voters and organizations, including the Plaintiffs, submitted a formal request to the Secretary for a reevaluation of the health risks posed by the BMDs during the pandemic.  (A true and correct copy of the Reexamination Request, submitted pursuant to O.C.G.A. § 21-2-379.24, and its relevant supplemental information, are attached hereto as Exhibit B).  The Secretary has not responded to the Reexamination Request and there is no indication that he will take any serious action to address the issues raised by the Request.

33.

Beyond authorizing the use of mail ballot dropboxes, neither the Secretary nor the State Election Board has made any attempt to issue guidance or emergency rules to safeguard the polling places and election offices.  The Centers for Disease Control has issued a publication providing guidance for improving public health and safety in elections entitled "Recommendations for Election Polling Place Locations – Interim Guidance to Prevent Spread of Coronavirus Disease (COVID-19) (attached as Exhibit C).  Defendants are not taking this or other expert advice to heart, and they have taken none of the essential steps required to keep elections in Georgia safe during the pandemic.

34.

For example, the Secretary should have anticipated that pollworkers would need masks.  He did not.  This left Cobb County in the position of having to post a request on the internet for public donations of personal protective equipment for pollworkers.  (A true and correct copy of Cobb County's internet posting is attached hereto as Exhibit D).

35.

On April 6, in the Secretary's only press conference to address the COVID-19 crisis, the Secretary, without any evidence, praised the touchscreen BMDs as safe and effective, stating that they represent a "good thing" that should not be changed. Rather than outlining any plan for relief or guidance to county election officials, the Secretary stated that he would appoint a voter fraud task force of law enforcement officials to investigate "all instances of uncured signature mismatches" on mail ballot envelopes and "unaccounted for votes from multiple voters sharing the same address."  These measures have nothing to do with mitigating the health risks posed by conducting an election during a pandemic. Existing laws already govern how so-called signature mismatches are supposed to be cured, and there is no evidence that deliberate forgeries cannot be investigated by existing law enforcement personnel.  And, of course, there is nothing fraudulent in sharing a home with another voter.  Dedicating additional resources to prevent mail ballot voter fraud does nothing to address or mitigate the impact of the COVID-19 pandemic upon Georgia voters.  The Secretary's inclination to focus on matters completely distinct from the public health challenge at hand speaks

volumes about the need for the Court's intervention to avoid chaotic and unconstitutional elections during an unprecedented global pandemic.

36.

The State Election Board has also not addressed the impact of the COVID-19 pandemic upon Georgia elections.  On April 15, 2020, Secretary Raffensperger led a long-scheduled meeting of the Board.  During the public comment period, citizens, including Plaintiff Jeanne Dufort, expressed grave concerns about voting safety, pleading with the Board to address the dangers the COVID-19 pandemic presents to public health in the polling places.  The Board did not, however, address the concerns raised. Instead, the only pandemic-related action that the Board took was to authorize mail ballot drop boxes as an emergency rule.  The same was true for the Board's seven-hour March 11, 2020 meeting: despite formal requests from Coalition for it to do so, the Board did not address any ways to mitigate the impact of COVID-19 upon elections in Georgia.

37.

The State Election Board has the duty to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections."  O.C.G.A. § 21-2-31(2).

Under the Secretary's leadership, the State Election Board is not fulfilling this
duty.

38.

County election boards cannot be expected to step into the role that must be
filled by the Defendants.  In fact, if a county election board were to take
independent action to modify election procedures to mitigate the impact of the
COVID-19 pandemic on a local scale, it is highly likely that the county would be
restrained or punished by the State Election Board for doing so.  For example,
earlier this year the Athens-Clarke County Board of Elections made the decision to
replace touchscreen BMDs with hand marked paper ballots because the county had
concluded that it was "impossible or impracticable" to use BMDs without violating
voters' state constitutional and statutory rights to absolute right ballot secrecy.  In
March, the State Election Board initiated formal action against the Athens-Clarke
County Board of Elections for making this independent decision, by levying fines
and threatening further action.  Unless counties are ordered to do so by the
Secretary or by the Board, local election  superintendents will be unable to take
steps to address the impact of the COVID-19 pandemic upon elections.

39.

For its part, the General Assembly's session is suspended and leadership appears disinclined to reconvene to address the impact of the COVID-19 crisis on the conduct of the upcoming elections.

**C.     The Course of the Pandemic and Upcoming Elections**

40.

It is extremely difficult to project the course of the pandemic in Georgia and nationwide because so little is known about the coronavirus or about how any easing of current restrictions may prolong the pandemic's spread or accelerate its reemergence.  And, even if Georgia's population generally were to become relatively free of COVID-19, "hot spots" can emerge or reemerge in a particular community that may mandate extraordinary and essential protective measures.

41.

Even in ordinary times, for elections to proceed in an orderly manner, and for citizens to be able to know sufficiently well in advance how, when, and where they can vote, the rules and procedures for voting must be established weeks in advance of any particular election.  In addition, for purposes of establishing the rules and procedures for voting, the time of an election is not Election Day itself,

but is, rather, the period of time beginning no later than the day when the State must begin mailing ballots to citizens and military voters overseas, which is currently 45 days prior to Election Day, and extending through Election Day itself.

42.

Because of the uncertainty of the course of the pandemic, the length of the election period in advance of an Election Day, and the need for election officials, election workers, and voters to know well in advance of the election how, when, and where to vote, rules and procedures to protect the right to vote during the present pandemic must be implemented immediately.

43.

The actions required to protect the right to vote during the pandemic fall into three major categories.  First, as averred below in Part V, to ensure that the more than month-long process of preparing for and conducting the election does not fall within the period in which Georgia is still fighting the pandemic, the June 9 election should be moved at least to June 30.  Second, as averred below in Part VI, substantial changes must be made to in-person voting to make it more safe, including most obviously the replacement of the touchscreen BMDs with hand marked paper ballots.  Third, as averred below in Part VII, a number of changes

must be made to absentee mail voting so that the State can accurately and securely

process the foreseeably massive increase in mail voting that will be caused by the

pandemic.   Fourth, as averred below in Part VIII, the Secretary must remedy

several specific recent failures that threaten to disenfranchise absentee voters in the

upcoming election.  Together the changes averred to be necessary in Parts V, VI,

VII and VIII will be referred to as the Pandemic Voting Safety Measures.

44.

As averred below in Part IX, although all Georgia voters' constitutional

rights will be infringed if Defendants do not undertake the Pandemic Voting Safety

Measures, the failure to do so will have a disparate and particularly severe impact

upon the elderly, the health-compromised, and those Georgians living in rural

areas.

## V.   CONDITIONS ARE UNSAFE TO HOLD THE ELECTION ON
## JUNE 9, 2020

45.

This action seeks to postpone the June 9, 2020 election at least until June 30,

2020 in order to protect pollworkers and to allow voters to vote without fear for

their personal health and safety.  Early in-person voting for a June 30, 2020

election would be required by statute to begin on June 8, 2020.  (O.C.G.A. § 21-2-385(d)(1)(B).

46.

Though Election Day itself is not presently set to occur until June 9, labor intensive preparation for the election should already be underway.  Ballots must be proofed, printed, and readied for mailing 49 days in advance.  (O.C.G.A. § 21-2-384(a)(2).  Workers must be recruited, hired and trained weeks in advance of in-person Early Voting, which for the June 9 election starts on May 18, 2020. Voter records must be updated.  Servers, voting machines, and tabulators must be programmed, tested, transported, secured, and set up in early voting polling places.

47.

State and local governments are already under enormous stress to fight the COVID-19 pandemic with skeletal staffs and do not have the time or resources to take all the actions necessary to conduct an orderly election.  Worse, even without the pandemic, this election features the largest new voting system implementation in the Nation's history.

48.

Unless the June 9 election is postponed, all of the foregoing required preparations will need to occur while the COVID-19 pandemic continues to ravage the State of Georgia.

49.

The Institute for Health Metrics and Evaluation at the University of Washington ("IHME") publishes projections on the course of the COVID-19 pandemic for each State and many countries and updates those projections every several days.

50.

According to IHME's best information, through April 17, 2020, 667 Georgians had died because of COVID-19.  IHME projects that, for the balance of April, up to another 2,028 Georgians could die of the disease.

51.

For May, IHME projects that the death toll in Georgia will continue to mount, rising by up to 1,295 more lives.

52.

For purposes of weighing the burden on the right to vote of holding the currently scheduled election during the pandemic, the most important figure is the high-end figure in the range of the projections; that is, for example, 1,295 deaths for the period of May 1 through June 1, 2020. IHME's projections are widely acknowledged to be among the best available, but IHME itself acknowledges that large uncertainty intervals occur because of limited and conflicting data. Because of these sources of uncertainty, IHME recommends that government officials "pay attention to the full range of values in our forecast, especially the upper values."

53.

Crucially, IHME's projections assume that Georgia's current social distancing regulations will remain in effect until June 15, 2020, permitting Georgia to enter a containment period. However, on April 20, the afternoon of this filing, Governor Kemp announced that various businesses will be permitted to reopen this week, despite the staggering number of daily COVID-19 related deaths. Within the 24 hours prior to this filing, 44 more deaths were reported in Georgia due to COVID-19. Indeed, IHME estimates that 34 Georgians will die of COVID-19 on April 27, the day that the rules will start to be relaxed. Experts have warned that it

is too early to reverse government mandated social distancing.  Only four days ago

on April 16, Governor Kemp warned that the peak of infections and deaths "keeps

moving away" into the future.  Since the State is relaxing these life-saving

measures so early, it is even more important to postpone the upcoming election

because it is much more likely that the pandemic will remain in full force longer

than anticipated.

54.

In addition, the accuracy of IHME's local projections depend upon the

accuracy of the number of locally reported deaths caused by COVID-19.  IHME

uses the number of reported deaths and an estimated fatality rate to estimate the

number of active infections, which in turn drives the projections for the duration

and severity of the disease.  The overall projections, therefore, are highly sensitive

to the reported number of deaths.  But in Georgia there is substantial evidence that

the number of deaths is underreported and, if this is the case, the duration and

severity of COVID-19 will be far worse that IHME currently is projecting.

55.

The IHME projections are for the entire state; the conditions in any

particular county will almost certainly be better or worse, or much better or much

worse, than the average for the state as a whole.  Thus, while the "average" county may be projected to suffer only its share of the statewide projected number of deaths, the conditions in many counties will be much worse.  The per capita death rate in Dougherty County, for example, is 15 times the state average.  And the variance is not just with small counties; the death rate in Chatham County is just a quarter of the rate of the State overall, but it could easily exceed the statewide rate in weeks to come as COVID-19 spreads into the area.

56.

It is not possible to project *which* counties will be experiencing more than the statewide average of deaths during the election period and, more important, it is not possible to postpone the election for just those counties.  But it is possible to project, to a near certainty, that for far too many counties, the COVID-19 pandemic will continue in full force through the June 9, 2020 election.  This foreseeable course of events places an unacceptable burden on the right to vote.

57.

Moving the date of the election from June 9 will also give the Secretary and the counties time to correct the problems associated with the Secretary's mailing of absentee ballot applications.  In an attempt to partially address the impact of

COVID-19 pandemic, the Secretary of State on or about April 6, 2020 mailed absentee ballot applications to all active Georgia registered voters.  Rather than using voters' mailing addresses, however, the Secretary used residential addresses. This was an inexcusable mistake by either the Secretary or the mailing vendor – the database includes a mailing address for each voter when it is different than the residential address for this very purpose.  As a result of this error, approximately 625,000 Georgians were not sent absentee ballot applications at their correct addresses.  Worse, the counties that have been hit the hardest by the COVID-19 pandemic are also rural counties in which the highest percentage of registered voters use a mailing address, not a residential address.  If the election is postponed to June 30, these voters will have the additional time necessary to obtain and submit absentee ballot applications, receive absentee ballots,  and vote by mail.

58.

The Secretary surveyed county election boards in early April to determine their staffing expectations before announcing the delay to June 9.  The results were alarming and supported a delay far beyond June 9.  For example, Lee County disclosed that it had lost almost 50% of its pollworkers. (Exhibit E)

59.

Separately, the Jackson County Election Board, recognizing both the impossibility of operating polling places safely and the loss of pollworkers, submitted a resolution to State Officials seeking to convert this election to an all mail-ballot election to safeguard the upcoming elections.  (*See* Exhibit F).

60.

Richard Barron, Fulton County's Election Director, told WAOK radio on April 14 that his office had 100,000 pieces of absentee ballot application mail to process, including the wrongly addressed undeliverable applications sent to residential addresses.

61.

In a video, Cobb County Elections Director Janine Evelar described the crushing workload caused by having to process an enormous increase in absentee ballot applications, the lack of supplies, and an inadequate number of pollworkers.[1]

---

[1]https://www.youtube.com/watch?v=apQiy4nxkGw&feature=youtu.be

62.

These chaotic conditions will not be resolved before the intense preparation activities necessary to support the June 9 elections begin.  More time is needed for election officials to meet the challenges posed by the pandemic and exacerbated by the Defendants' inaction. Although election officials bear these burdens directly, their collective inability to successfully conduct the upcoming elections will indirectly result in severe burdens on Georgia voters.

63.

Moving the date of the upcoming election is not prohibited by federal law (unlike the date of the Presidential election in November, which may only be moved by Act of Congress).  Many States have already postponed their primary elections until well into the summer in order to protect voters. Some have pushed their state and federal primaries into July, including New Jersey (July 7), Louisiana (July 11), and Alabama (July 14).  Kentucky, New York, and Virginia have postponed their States' primaries until June 23. North Carolina postponed its Congressional District 11 runoff to June 23.

64.

Georgia law gives the Secretary the discretion to move this election again (from its current date of June 9) because of the ongoing national emergency. (O.C.G.A. § 21-2-50.1).  In addition,  moving the election to June 30, 2020 will not require moving the currently scheduled August 11, 2020 runoff elections.  Military and overseas voters can also receive ballots for the August 11 runoff in a timely fashion with the more compressed June 30 election schedule.

65.

Not moving the election from June 9 to at least June 30 threatens to unreasonably burden Plaintiffs' right to vote because it will force voting during pandemic conditions and because election officials will be unprepared to conduct in-person elections or process absentee mail applications and ballots in an orderly, accurate, safe, and secure manner.

## VI.   CHANGES TO IN-PERSON VOTING

### A.   Touchscreen Ballot Marking Devices Must be Replaced by Hand Marked Paper Ballots

66.

Prior to the onset of the pandemic, the State of Georgia was in the process of implementing the first statewide use of a new voting system featuring touchscreen

ballot marking devices (BMDs) supplied by Dominion Voting Systems.  This is the

largest and most complex voting system conversion ever attempted in the Nation.

To date, the new system has only been used in about 225 Georgia polling places.

In the next election, the new system will be used for the first time in 2,075 other

polling places, a singularly challenging endeavor that unavoidably will require an

enormous amount of training, debugging, and complex installation work. This

daunting work is made more complex by the loss of thousands of experienced and

trained pollworkers due to the pandemic, and the need to safeguard those who are

assigned to those labor-intensive tasks of voting system preparations.

67.

BMDs are plagued with serious constitutional defects that are being

challenged in other litigation.  *See Curling v. Raffensperger,* No. 17-cv-29898-AT

(N.D. Ga.).  For example, like other electronic touchscreen voting systems,

election results generated by BMDs are not auditable because they leave no record

of a voter's selection that itself is not generated by a computer which may be

defective because of malfunctions, misprogramming, or malicious interference.  In

addition, the large size of the touchscreens, and the large font they use to display

voters' choices, exposes voters' choices to other voters, pollworkers, and the

public in violation of constitutional and statutory provisions guaranteeing voter privacy.

68.

Even if touchscreen BMDs survive the constitutional challenges pending in the other case, the coronavirus pandemic has rendered communal touchscreen devices such as BMDs completely unsuitable as a mode of safely recording votes because such devices pose an unacceptable and irremediable risk to the health of voters and pollworkers.  The same is true for the touchscreen electronic pollbooks, such as the State's PollPads, which the State uses to check-in voters.[2]

69.

According to the March 15, 2020 Rapid Expert Consultation on SARS-CoV-2 Surface Stability and Incubation for the COVID-19 Pandemic published by The National Academy of Sciences, the coronavirus survives "up to 24 hours on cardboard and up to 2-3 days on plastic and on stainless steel."

_____

[2] The amount of touching that is required to use and vote on a BMD is seen in a short video produced by the Secretary.  https://bit.ly/2zbTpOd

70.

Virtually every component of the BMD touchscreen system and PollPad that voters touch is plastic, steel, or cardboard, and voters and pollworkers will touch each of these surfaces multiple times for each ballot cast.  Multiple voters and pollworkers will operate each machine in quick succession during the course of in-person voting.

71.

Every step in the BMD voting process presents an opportunity to spread or be infected by COVID-19 and there is no practical means of keeping the touchscreen components clean.  This health threat alone will discourage people from voting (and potentially from working) in the polling places.

72.

BMD touchscreens themselves cannot be kept clean unless, at a minimum, they are thoroughly cleaned after very voter.  However, according to Dominion, their touchscreens should first be powered down before cleaning is performed.  After the touchscreen is turned off, the pollworker will need to carefully clean the screen with a special disinfectant.  If the screen is not dry when it is used again, the screen may fail to reliably translate the next voter's touch into the intended election

choice.  The screen, therefore, will need to be completely dry before it is powered

up and used again. Rebooting takes time.  The additional staff and time required in

the polling place for such extra effort is infeasible and impractical in the context of

the present pandemic and further increases the time for human interaction.

73.

The BMD touchscreens were not manufactured to be cleaned after every use

and have never been tested to determine whether, or for how long, they will

withstand such scrubbing.

74.

Touchscreen system manufacturers warn that if pollworkers do not clean the

screens very carefully, the screens or other system components will be damaged

and the unit will have to be taken out of service.  It can be anticipated that voters,

fearful of touching the screen, will bring their own sanitizing solutions for cleaning

the screen before use, much as many people now do when they take an airline seat

or a shopping cart. The blue privacy panels surrounding the touchscreens when

configured in the manner recommended by the Secretary will not permit the

pollworkers to observe voters attempting to clean the screens themselves.

75.

The process of powering down a BMD voting machine, cleaning the screen, letting it dry, and powering it up again *after each voter* is so time consuming and labor intensive that the effort, even if executed to perfection, will inevitably derail the in-person voting process and disenfranchise voters.  More likely, the effort will be attempted but, with inadequate staff, not executed to perfection and voters will be exposed to the virus *and* disenfranchised because of system malfunctions and interminable delays.  It also is highly unlikely that additional pollworkers could be recruited for this dangerous work, particularly given that there already is a pollworker shortage.

76.

In addition, the BMD system voting process, particularly with the incessant cleaning and associated delays, will intensify close person-to-person contact between and among voters and pollworkers – exactly the kind of close personal contact that social distancing and other public health measures are designed to curtail.

77.

The handling of 33,000 BMD touchscreen units and over 40,000 auxiliary

components also poses an unacceptable risk to election workers, vendors,

technicians, and other election officials in other respects.  To prepare for an

election, election workers must program each touchscreen BMD using removeable

memory cards. After machines are programmed, each of the 33,000 machines must

be tested in public for proper programming in a Logic and Accuracy Test (LAT),

which is required by statute.  The public testing will occur during a time when the

State's stay-at-home restrictions will prevent the public and authorized poll

watchers from observing and verifying these tests.  The LAT that each of the

State's 33,000 touchscreen BMDs must undergo is an extremely time-consuming

process that requires close personal contact among election staff and the public and

continuous contact with potentially infected surfaces.  In addition, each BMD

touchscreen along with its printer and battery back-up unit, and 33,000 plastic

"privacy" screens, must be manually unpacked, transported, and installed by teams

in each of the State's 2,300 polling locations, frequently in tight spaces.

78.

The danger of the BMDs to Georgia's 8,000-plus pollworkers and other election staff is a separate humanitarian concern, but it will directly contribute to causing voter disenfranchisement and will reduce election integrity and security. Unless there is an environment and process that actually protects voters, pollworkers, and other election staff, election superintendents will be unable to recruit and train workers in sufficient numbers to staff the 2,300 polling locations and process mail ballots in a manner to assure adequate voter polling place access and a secure and fair election. Superintendents will be required to choose between taking short-cuts and loosening security controls, or closing polling locations, limiting early voting, limiting voting hours, or taking other actions that will directly and indirectly burden voters in their exercise of the right to vote.

79.

To insist that voters use touchscreen BMDs for in-person voting is an unreasonable burden on the right to vote because that requirement forces voters to choose between their personal safety and exercising their right to vote and because the State has a reasonable and available alternative: replacing BMDs with hand

marked paper ballots, which can be counted by the new already installed Dominion scanners and tabulation system.

80.

Because of the risk that the State would be unable to implement the new BMD system in time for 2020 elections, on August 15, 2019, the District Court in *Curling v. Raffensperger* ordered the State to develop a backup plan using hand-marked paper ballots instead of BMDs and to pilot that backup plan in selected November 2019 elections.  (No. 17-cv-2989-AT, Doc. 579 at 146).  Cobb County successfully piloted using hand marked paper ballots, with new Dominion optical scanners and tabulators, in the November 2019 elections.  This already-prepared backup plan can feasibly be deployed statewide to address the dangers posed by the coronavirus.

81.

Using hand marked paper ballots will be far safer and far easier than using BMDs for multiple reasons.  Paper ballots may be issued to voters in sanitary, disposable envelopes and privately marked by the voter using a single-use disposable marker on a single use disposable writing service such as stiff cardboard.  The voter can cast the paper ballot into a secure ballot box or scanner.

Using hand marked paper ballots will eliminate the pollworker labor hours needed to educate voters on the complex, new BMD voting system, and to assist voters in the polling place, which involves considerable close personal interaction.  Using hand marked paper ballots will greatly accelerate the process of polling place voting and therefore will reduce lines and will help mitigate the dangers posed by person-to-person contact.

82.

Using paper ballots instead of BMDs has the collateral benefit of allowing polling locations to physically accommodate more voters voting simultaneously with a safe distance between them, with less (or no) down time due to equipment failures or cleaning delays. This will allow a faster flow through the polling place, thus reducing the voters' time spent in line and minimizing their exposure to other voters.

83.

Using hand marked paper ballots also will allow secure drive-up or "curbside" voting as polling locations, with accommodations for those who need to come into a polling place.

84.

The enormous amount of time saved by not having to program, set-up, test, transport, and install the 80,000 plus BMD components, and by not having to clean the BMDs after every use, will dramatically reduce the number of pollworkers needed to staff a polling location, thereby reducing the difficulty of engaging a sufficient number of pollworkers.  Saving on the cost of thousands of labor hours will aid counties that are experiencing massive budget shortfalls because of the pandemic.

85.

There is no good reason to use BMDs rather than vastly safer and less expensive hand marked paper ballots.  The State already uses hand marked paper ballots for provisional and absentee mail ballot voting; eliminating BMDs will simply require that the State order more printed paper ballots.  Switching to hand marked ballots greatly simplifies checking in voters before they vote because the PollPad need not create a smartcard for activating the touchscreen BMD. No change of procedures is required for scanning and tabulating the ballots cast.

86.

Using hand marked paper ballots is the most widely accepted voting method in the nation and is universally recommended by election security experts. Hand marked paper ballots are used across the nation in approximately 112,000 precincts covering 133 million registered voters.

87.

The State of Georgia's requirement that all in-person voters must use BMDs during the pandemic is unconstitutional because it constitutes a severe, unreasonable, and completely unjustified burden on the right to vote. Plaintiffs are entitled to injunctive relief requiring the Secretary to cause upcoming elections in Georgia, including the June 9, 2020 election (whether moved to June 30 or not), to be conducted using hand marked paper ballots.

88.

BMDs should continue to be used for voters requiring assistive technology, if no better alternatives are proposed by the Secretary. After every use of the BMD touchscreens, the touchscreen should be powered down and thoroughly cleaned by vendor-approved disinfectant cleaner.

**B.     Other Required Changes to In-Person Voting during the Pandemic**

89.

In addition to using hand marked paper ballots instead of touchscreen BMDs, other changes to in-person voting must also be made to keep voting reasonably safe for voters and pollworkers during the course of the pandemic. These other changes include the following.

**1.     Early Voting**

90.

Each early voting location should operate (as they do today) as a "vote center" in which any eligible voter in the county may vote.

91.

Early voting polling place managers should be appointed as absentee ballot clerks as authorized by O.C.G.A. § 21-2-385 to issue absentee mail ballot packets that the voter may take home to mark to avoid more time and human interaction in the polling place.

92.

Superintendents should be authorized to operate early voting centers at their option during the weekend and on the Monday prior to Election Day or any portion

of Election Day, provided that doing so does not interfere with accurately updating

pollbooks for Election Day voting.

93.

At the county superintendent's option, early voting locations should be

authorized to open at any time after an adequate supply of printed ballots are

available for use, subject to the statutory minimum required by O.C.G.A. § 21-2-

385 (d)(1).

### 2.    Curbside voting

94.

To reduce the number of voters inside polling locations, each county should

provide at least one curbside early voting location where voters may vote in-person

from their automobile by being issued a paper ballot, disposable pen, and

disposable stiff cardboard support sheet, or may drop off completed mail ballots.

For counties with over 100,000 registered voters, one additional curbside voting

location should be available for every 100,000 voters or fraction thereof. Curbside

voting is a proven alternative long used in some states for senior citizens or voters

with disabilities.  Curbside voting polling locations would be provided in addition

to traditional Election Day polling locations.  Curbside voting protects both voters

and pollworkers because voters remain in their cars and social distancing is

maintained with other voters. Automobile window glass also provides additional

protection.

### 3.    Mobile Pop-up Polling Places

95.

Superintendents, at their option, should be authorized to use well-marked

official county-owned vehicles such as buses or vans to create temporary "pop up"

early voting locations where appointed absentee ballot clerks can issue and accept

paper absentee ballots, although voting should not occur inside the enclosed

vehicle. The Secretary should issue guidelines for the secure and safe operation of

such pop-up early voting sites.

### 4.    Ballot Security and Chain-of-Custody

96.

Georgia law currently allows counties either to scan paper ballots at the

polling locations or to transport the ballots to the superintendent's office for central

count scanning at their option.  (O.C.G.A. § 21-2-485).  The Secretary should issue

guidelines for use of central count scanning, including ballot security and chain-of-

custody protocols to provide counties with guidelines to use traditional secure

ballot boxes rather than scanners at polling places as may be appropriate.

### 5.    Electronic Pollbooks

97.

Electronic pollbook component PollPads should be optional for use, and

each county should be authorized to determine whether their use is required for

paper ballot issuance. PollPads which require pollworker and voter touching

should not be used if the county can rely on less touch-intensive laptop epollbooks

used currently in early voting. It is imperative that electronic pollbook information

be accurate and updated, and properly backed up by updated paper copies in the

polling place, to avoid excessive time required for the pollworker and voters

interacting to resolve discreprancies. BMD touchscreen manual activation (in lieu

of plastic smart cards) by the poll manager should be used in the case of voters

who require BMD voting for assistive technology.

### 6.    Voter ID and Check-in

98.

In lieu of the voter signing the voter certificate for in-person voting,

pollworkers should be authorized to administer and document oral oaths by the

voter containing the same content as the written oath. This reduces the handling of

hundreds of thousands of pieces of paper, pens, and related equipment.

99.

To reduce the touching of surfaces by multiple people, a voter should be

authorized to present a legible disposable paper copy of their photo identification

(such as driver's license) as sufficient for personal identification either in-person or

mail-in voting.

### 7.    Personal Protective Equipment and Workspace Shields

100.

Pollworkers and support staff must be supplied by the Secretary at the

Secretary's expense with a sufficient supply of the kinds of personal protective

equipment ("PPE") recommended by the Georgia Department of Public Health,

including CDC-approved masks and protective gloves.

101.

In-person voters who enter enclosed polling locations or lines forming on the

outside of the polling locations must be directed to wear masks (except for

curbside voting locations.)  Single-use disposable masks should be supplied by the

county for voters who do not wear their own masks. The State should reimburse the counties' costs for the masks.

102.

Pollworkers should be directed to work behind clear plastic barriers to issue ballots and assist voters. The barriers should be supplied by the election superintendent and the cost reimbursed by the State.  An example is at  Exhibit G. In consultation with the Georgia Department of Public Health, Secretary Raffensperger should issue guidelines for minimum specifications for the plastic shields and provide at least one source of supply.

103.

The Secretary should order the county superintendents to mark off distances on the polling place floor and outside the polling place where lines form and require that voters remain at least six feet from each other.

## VII.  CHANGES TO ABSENTEE MAIL VOTING

### A.    Conditions Causing Need for Changes

104.

Because of the health risks of in-person voting, the necessity and demand for voting by absentee mail ballots will foreseeably continue to increase dramatically.

If this demand is not satisfied in a timely, efficient, and secure manner, the COVID-19 pandemic will further disenfranchise Georgians and threaten the health and safety of voters, pollworkers and election staff.

105.

In its recent elections, the State of Wisconsin experienced a five-fold increase in the number of mail ballots requested and cast. Wisconsin was not prepared to process that many absentee ballot applications or ballots. Thousands of Wisconsin voters who timely submitted applications for absentee ballots did not receive the ballots in time to mail them back prior to election day. By the time officials realized that widespread disfranchisement was occurring, it was too late for the elected officials or the Courts to provide an adequate remedy. Many of those voters then had no alternative but to vote in crowded polling places.

106.

In the past, only 5% of Georgians have voted by mail, but with the pandemic that percentage is expected to grow by more than ten-fold. On April 16, the Atlanta Journal Constitution reported that there are a record 395,000 applications for mail ballots only 9 days after the Secretary sent applications to all

active voters.  The State of Georgia, like Wisconsin, is not prepared to process the

coming massive increase in mail ballot voting.

107.

A large percentage of mail absentee voters will be new to the process and

unfamiliar with the State's rules, which can be difficult to follow under even ideal

conditions.  In addition, there is every indication that the U.S. Mail in Georgia will

continue to be much slower than normal, as it was in advance of the Wisconsin

elections.  In addition, because of COVID-19, state and county election offices that

are ordinarily equipped to answer questions about absentee mail voting are already

understaffed and will be completely unable to handle the coming deluge of

questions and paperwork.  Therefore, a more resilient mail ballot process is

necessary to protect voters' rights.

108.

There already is evidence that the Secretary is not prepared for what will be

a massive increase in absentee mail ballot voting.  (Three specific examples of

recent failures by the Secretary relating to absentee mail ballot voting are described

separately in Part VIII, below).

Page 51

**B.    Modifications Required to Absentee Ballot Processing**

109.

Given the unprecedented increase in demand for absentee mail voting, and the State's current inability to administer absentee mail voting efficiently and securely, there is substantial risk that Georgia citizens will be disenfranchised unless the following changes are made to Georgia's absentee mail voting practices and procedures:

- Voters should be permitted to return completed mail ballots at any polling place, present their identification, and have the ballot accepted for counting, without the risk of signature rejection or postal delays.

- All 2020 mail ballot applicants should be permitted to make a one-time application for mail ballots all elections for the remainder of the election cycle.

- As soon as printed ballots are available, voters should be permitted to obtain mail ballots at the offices of the absentee ballot clerks to reduce wait times, polling place crowds, and officials' administrative workload.

- At the county superintendent's option, absentee ballot clerks in any polling location should be authorized to securely *issue* mail ballot packets to the voter and determine and document his or her eligibility at the time of issuance by referencing the voters' photo identification.

- Absentee mail ballots post-marked no later than Election Day and received up to three days after Election Day should be accepted as timely cast. Additionally, ballots arriving by mail on the day after Election Day *without a postmark* should be accepted as timely cast.

- Absentee ballots cast by voters covered by the Uniformed and Overseas Citizen Voting Act ("UOCAVA") should be accepted as timely received if the ballot arrives prior to the final day for the superintendent's certification of election results, which is the second Friday following the election. (O.C.G.A. §21-2-493(k)).

- Voters should be permitted to present their affidavit to cure discrepant signatures or provisional ballots prior to the final day for the superintendent's election results certification, which is the second Friday following the election. (O.C.G.A. § 21-12-493(k)).

- Election office scanning of mail ballots should be authorized to begin on 7 am Monday prior to Election Day, but no tabulations (partial or complete) should permitted until the county polls have closed on Election Day.

- The majority of a county-level bi-partisan review panel should approve the rejection of any mail ballot signature prior to notifying the voter for signature curing.

- The Secretary should require all counties to participate in the Secretary's daily public reporting of early voting and mail ballot voting including signature rejection processing to assist voters and candidates in monitoring ballot acceptance progress.

- Authorized poll watcher and public observation protocols should be established for oversight and voter protection for all mail ballot issuance, acceptance, and tabulation operations.

## VIII. SECRETARY'S FAILURES TO PROPERLY PROCESS ABSENTEE BALLOTS

110.

In addition to the necessity to change election practices and procedures generally going forward, the Secretary must also remedy several specific actions that threaten voter disenfranchisement in the upcoming election.

111.

On or about April 6, 2020, the Secretary reportedly mailed to all active registered Georgia voters the mail ballot applications for the May 19, 2020 election (formerly March 24 election; now being held on June 9).  Rather than addressing the ballot applications to the voters' mailing addresses, however, the Secretary mailed applications to voters' residential addresses.  This caused up to 625,000 registered voters to not receive their undeliverable applications.  This error was inexcusable: the information in the Secretary's database for each registered voter shows a residential address and, if different, a mailing address.

112.

Despite knowing of this failure for at least two weeks, the Secretary has not informed the press or the voters of this failure.  Hundreds of thousands of voters do not know that they should have received a ballot application.  Voters in rural areas

who frequently do not have home mail delivery are particularly victimized by the Secretary's mistake.  There are only limited ways for rural voters to obtain primary election information or ballot applications because small county election offices are closed during the pandemic, and often have only limited information on their websites that would not include a downloadable ballot application.

113.

This failure has had a particularly severe impact upon rural counties that have been hit the hardest by the pandemic.  For example, rural Randolph County has COVID-19 related death and infection rates that are well over ten times the state average.  Over 23% of the voters in Randolph County do not receive election mail at their residential address, but have mailing addresses.  Only 76% of the homes in Randolph County have internet access that would provide an alternative to obtaining and submitting a ballot application.  Randolph County is but one example of rural counties that have been disadvantaged by the Secretary's failure to send ballot applications to the voters' mailing addresses.

114.

For all voters to have an equal opportunity to complete a ballot application

request, the Secretary should promptly send ballot applications to those voters

whose mailing address is different than their residential address.

115.

Additionally, the Secretary printed the wrong county email return address on

some applications.  In other instances, county officials were not informed of the

technical requirements for email submissions and their servers are rejecting the

large files containing photographs of the ballot applications. In yet other instances,

the voters' application attachments are not opening in the existing systems.  All of

these failures and errors ultimately cause significant delays that require extension

of time for officials and voters to correct.

116.

Another confounding example of the Secretary's apparent willingness to

disenfranchise absentee voters without cause has arisen because of how the

Secretary is handling absentee ballots that voters received for what was the March

24, 2020 election (which included the Presidential Preference Primary) ("the

March Ballots").  On March 14, 2020, before those absentee ballots were due to be

returned, all March 24 elections were moved to May 19, 2020; the Election Day

was later changed to June 9, 2020.  Before the election was moved from May to

June, the Secretary mailed absentee ballot applications to the residential addresses

of all active voters, including those who had already received a March Ballot.

Absentee ballots that are issued in response to these applications ("June Ballots")

will be of two types.  For voters whose records indicate that no March 24 ballot

was voted by March 24, the mail ballot to be issued will include races that were

originally scheduled for March 24 (including the Presidential Preference Primaries)

and races that were originally scheduled for May 19 (including the primary for

U.S. Senate and a State Supreme Court seat).  For voters whose records show that

a ballot was returned for the March election, the mail ballot to be issued will

include only the races that were originally scheduled for May 19.

117.

Each change to the Election Day changed the due date for receiving absentee

ballots.  On or about March 16, 2020, however, the Secretary informed the press

that completed March Ballots that were received after March 24 would be

cancelled.  The Secretary has now changed those instructions by instructing

county officials to cancel completed March Ballots if not received by March 24

*and* if the voter *requests* a June Ballot. Therefore, March Ballots received after March 24 will be cancelled whether or not the voters actually received or returned a June Ballot.  But many applications are improperly processed or not received and many voters will not understand that by requesting but not casting a June Ballot his or her March Ballot will be cancelled.  This plainly unfair and unconstitutional disenfranchisement could be avoided if the Secretary ordered the opposite: that is, only cancel a March Ballot if a completed June Ballot with March races included is received from the same voter.  The Secretary must be ordered to instruct the county superintendents to count all March ballots received by the June 9 Election Day (or any new date of the election) if duplicate votes are not submitted.

118.

The Secretary not only is failing to keep voters informed, he is affirmatively instructing county officials to misinform the public.  For example, absentee ballots for the June 9, 2020 election will not be printed and issued until the week of April 20.  The Secretary, however, ordered superintendents to record dates of March 31 and April 6 as the date that these yet-to-be-mailed ballots were issued.  These incorrect dates now appear on voters' My Voter Page records on the Secretary's website.  This has confused voters, including some Coalition members, who

mistakenly believe that their ballots have been lost in the mail. Additionally, as of last week, the Secretary had posted April 21, 2020 as the date that many voters' ballots **_were issued_**, although that date had not arrived, and there is no assurance that the ballot will be issued on that date. This has confused voters, including some Coalition members, who assumed that the April 21 date was a typographical error and an earlier date was intended, causing them to be concerned that their ballots have been lost. The Secretary should be required to instruct the superintendents to correct the date of issuance records so that voters can track the progress of their ballot requests.

119.

The Secretary's insensitivity to providing equal voting opportunities to communities of color and protection of all voters was further displayed in his failure to create a dual language ballot application in Gwinnett County, which is the subject of unrelated litigation, Georgia Association of Latino Elected Officials v Raffensperger, No. 20-cv-01587-WMR, (N.D. Ga.).

IX.   **DISPARATE IMPACT OF DEFENDANTS' INTENDED CONDUCT UPON THE ELDERLY, HEALTH-COMPROMISED AND GEORGIANS  LIVING IN RURAL AREAS**

A.   **The Elderly**

120.

It is well understood that COVID-19 is particularly dangerous for older

voters.  In Georgia, people 65 years and older make up only 13% of the population

but as of April 16 account for 67% of Georgia's deaths from COVID-19.  This

dramatic difference in the vulnerability of older voters to COVD-19 has a

substantial impact on how and when to conduct elections for many different

reasons.

121.

It is fundamentally unfair to conduct an election in a public health

environment in which it will be dramatically more difficult for older voters to vote

safely.

122.

Older voters, including some Coalition members, are likely to have

disproportionately greater difficulty in finding alternatives to voting in-person than

younger voters will.  Many will have never voted by mail and many others will not

familiar enough with, or even have access to, the internet for locating ballot applications or tracking mailed ballots.  County offices which might otherwise be available to help or answer questions are already understaffed and stretched to the limit and are asking that voters not call them about ballots.

123.

Older Georgians staff Georgia's elections.  The estimated age for pollworkers is about 70.  Unless elections are conducted at a time and in a manner that is safe, it is unrealistic to expect that counties will be able to recruit sufficient pollworkers and, even if they are recruited, it is inhumane to have them working in an environment that is not as safe as possible.

**B.      Health-Compromised**

124.

The COVID-19 pandemic also is particularly dangerous for those who have existing medical conditions, such as chronic lung disease, cancer, immune deficiencies, poorly controlled HIV or AIDs, obesity, diabetes, chronic kidney disease and liver disease.  The vast majority of people who die from COVID-19 have underlying conditions such as these.

125.

It is fundamentally unfair to conduct an election in a public health

environment in which it will be dramatically more difficult for voters with these

conditions to vote safely.

### C.   Georgians Living in Rural Areas

126.

The COVID-19 pandemic has hit rural counties in Georgia particularly hard.

In Dougherty County, for example, 91 people have died of the disease – more

deaths than in any other Georgia county and far more deaths relative to population

than any state in the country, including New York, the current epicenter of the

outbreak.   Nearby Randolph County is also experiencing a catastrophic event,

suffering a fatality rate thirty times higher than the state average.  Sumter and

Terrell Counties report infection and fatality rates far surpassing Atlanta's or even

New York's, and press reports indicate that actual deaths caused by the disease are

likely higher than reported.

127.

Rural counties, already hard-pressed to address the immediate public health

emergency, are particularly ill-equipped to prepare for, staff, and conduct an

election, particularly given the complex transition to an entirely new voting system.

128.

In addition, many citizens in rural counties do not have access to the internet or to other infrastructure or communication channels that would facilitate alternatives to dangerous in-person voting.

129.

Dozens of traditional precinct polling places in Southwest Georgia are small concrete structures measuring 300 to 400 square feet with no running water. Attached as Exhibits H, I and J are photographs of polling places in Colquitt and Sumter Counties.  Social distancing is impossible in such close quarters, and disinfecting polling places and hand washing is far more difficult with no running water.

130.

It would therefore be particularly unfair and unconstitutional to require citizens in these hard-hit communities to vote without first taking the Pandemic Voting Safety Measures described above.

## X.    STANDING

### A.    Coalition

131.

Coalition has organizational standing on its own behalf and associational standing on behalf of its members.

132.

Coalition is a membership organization with a membership that consists of individuals residing in Georgia and across the United States.  Individuals become members of Coalition by providing their contact information and indicating a desire to associate with the organization. Members donate money, contribute time, and share information and intelligence with the organization to the extent they are able and wish to do so.  Members receive informational communications from Coalition and can benefit from Coalition's facilitation of members' individual participation in civic activities that are germane to the organization's purpose, such as poll watching, auditing election results, and publishing opinion pieces. Members utilize Coalition as a resource to answer a wide range of voter questions about voting rights, voting processes, open meetings law, public records law,

recalls, petition processes, election legislation, and how to challenge election issues they encounter.

133.

Coalition's purpose is to preserve and advance the constitutional liberties and individual rights of citizens, with an emphasis on preserving and protecting those private rights of its members that are exercised through public elections.

134.

Coalition serves its purpose in multiple ways, including by providing information and education to its members; by serving as a non-partisan educational and informational resource for the public, press, campaigns, candidates, and political parties; by monitoring nationwide developments in election law and technology; by providing speakers for events at educational institutions; by providing commentary from its leadership on election issues; by collaborating in voting rights and election integrity initiatives with other nonpartisan nonprofits and academics; by developing and sharing research and investigation of reported election problems with the press, public and other members of the election-integrity community; and by facilitating the engagement of members and

prospective members as non-partisan participants in the electoral process through poll watching, attendance at public meetings, and other civic activities.

135.

Coalition, acting on its own behalf, has organizational standing because it has been and will be directly harmed by having to divert its own scarce personnel and resources to counteract Defendant's unconstitutional failure to address the impact of the COVID-19 pandemic upon elections in Georgia, including paying for fees to lawyers for advice and representation, litigation expenses, potentially consulting expert fees, travel expenses and related costs, and the diversion of approximately 75% of the time of Coalition's Executive Director Marilyn R. Marks since February 2020 to address the issues raised in this Complaint, time that the Executive Director would otherwise have devoted to Coalition's work in North Carolina and Colorado and other work in Georgia, including educating voters on the moving of the election and the impact on the ballot content, educating the public and officials about North Carolina's unconstitutional voting equipment, secret ballot violations, and advocating for North Carolina legislative changes relating to those issues.  These diversions of resources will continue if Defendants engage in their intended conduct alleged in this Complaint.

136.

Coalition, acting on behalf of its members who are threatened with imminent injury-in-fact, including the Member Plaintiffs previously identified and other, non-plaintiff members who would have standing to sue in their own right, also has associational standing to bring the claims for prospective relief stated herein. Coalition has a number of Georgia-based members who are eligible Georgia voters who prefer to vote on election day in the polling place, along with other members who prefer to vote by paper mail ballot.

137.

Some Georgia-based Coalition members have experienced confusion and frustration, fearing that their ballots have been lost because of the inaccurate information posted by the Secretary related to ballot application issuance and mail ballot transmission on the Secretary's My Voter Page.  Others are concerned because of the lack of information posted on their My Voter Pages about whether their ballot application or completed ballot transmitted days or weeks ago has been received.  Many county offices are closed and unavailable to answer questions on ballot status. Some counties are so overwhelmed by the staff shortage and

paperwork overload that they have asked voters not to call the election office about their ballot applications.

138.

Coalition is diverting resources in assisting voters and voting rights groups in counties which had a high percentage of voters who were victimized by the Secretary's ballot application mailing error.

**B.      Individual Plaintiffs**

139.

Plaintiff Rhonda Martin is a member and director of Coalition.  Ms. Martin is a registered voter in Fulton County, State of Georgia, who intends to vote in upcoming elections. Ms. Martin has served as a poll watcher in numerous counties authorized by a state political party, and expects to serve as a pollwatcher again in 2020 elections. Ms. Martin would prefer to vote in person in the polling place on or close to Election Day using a hand marked paper ballot, or to hand deliver a mail ballot to a Fulton County election office.  However, because of the pandemic and her concern about the transmission of disease, on April 6, she applied for a mail absentee ballot for the May 19/June 9 election, and emailed that request to Fulton County. Because of the pandemic she plans to return the voted ballot through the

United States Postal Service.  As of the date of this filing, she has not received the requested mail ballot and her My Voter Page  does not show the receipt of the emailed ballot application.  Ms. Martin does not know whether her application was lost or whether submitting another application would increase confusion or subject her to risks of disfranchisement or legal jeopardy.

140.

Plaintiff Jeanne Dufort is a member of Coalition and registered voter in Morgan County, State of Georgia, who intends to vote in upcoming elections. Ms. Dufort generally prefers to vote on a hand marked paper ballot and hand deliver it to her county election office because she does not wish to vote on a touchscreen machine. However, at times, because of scheduling necessities, she has voted on touchscreen machines in her home precinct.  Ms. Dufort requested a mail ballot via email on April 3 and her application was entered the next business day, April 6 on her My Voter Page.  The My Voter Page site soon reflected a ballot issuance date of April 6. However, on approximately April 19 the MVP site was changed to report a ballot issue date  of April 21. As of the date of this filing, Ms. Dufort has not received her mail ballot.

141.

When Ms. Dufort receives her mail ballot, depending on her evaluation of the health risks, she will determine whether to continue her standard process to hand deliver the ballot, or to mail it. However, the Morgan County Elections Office is now closed to the public, so mail is currently the only option.

142.

Ms. Dufort has been appointed as an authorized poll watcher and expects to be appointed as such again during 2020. Ms. Dufort is the First Vice Chair of the Morgan County Democratic Committee and in that capacity helps recruit, assign, and instruct poll watchers for the Committee for purposes of witnessing and verifying steps in the conduct of the Morgan County elections, and ensuring through the poll watching process that the interest of Democratic candidates and Morgan County voters are protected in the ballot acceptance, processing, and counting processes.

143.

Aileen Nakamura is a member of Coalition and a registered voter in Fulton County, State of Georgia, who would prefer to vote in-person at her home precinct in upcoming elections if a safe location and secure voting process were offered.

She has not applied for a mail ballot because she is waiting to assess the state of the pandemic closer to Election Day and polling place conditions at the time of the elections.

144.

Ms. Nakamura has served both as public election observer to help ensure the fairness and accuracy of Georgia elections and as an authorized poll watcher for a candidate in a non-partisan election.  She plans to serve as an election observer or poll watcher in remaining 2020 elections.

145.

B. Joy Wasson is a member of Coalition and a registered voter in DeKalb County, State of Georgia, who intends to vote in upcoming elections. Because of her concern about the safety issues in the polling places and the mail ballot application and ballot processing times, on April 6, 2020, Ms. Wasson requested a mail ballot via email for the June 9 election. She has received no response, and her My Voter Page record does not show receipt of the application.

146.

Ms. Wasson has served as a poll watcher appointed by political parties to protect the rights of voters and to verify elements of the elections she was assigned

to observe.   She plans to serve as a poll watcher in remaining 2020 elections but is apprehensive about the health risks that she will be exposed to if she does so.

147.

Elizabeth Throop is a member of Coalition and a registered voter in DeKalb County, State of Georgia, who intends to vote in upcoming elections. Ms. Throop voted in person during early voting in the March 24 Presidential Primary Election prior to its postponement. Given the potential dangers of voting in the polling place during the June 9 election and the potential delays in mail ballot processing, Ms. Throop promptly applied for a mail ballot for the June 9 election, and My Voter Page  shows that her mail ballot was issued on April 21.  But Ms. Throop has not received her ballot and does not know when to expect it.

148.

Ms. Throop has served as a poll watcher appointed by political parties to protect the rights of voters and to verify elements of the elections she was assigned to observe as a watcher. She plans to serve as a poll watcher in remaining 2020 elections but is apprehensive about the health risks that she will be exposed to if she does so.

149.

Each of the named individual Plaintiffs identified above, if required to vote in person without the Pandemic Voting Safety Measures in place, will be irreparably harmed because of the dangers posed by the COVID-19 pandemic, including but not limited to the exposure to other voters and to contact with physical surfaces that are likely to be contaminated with the virus.  In addition, each of the named individual Plaintiffs identified above, if required to vote absentee by mail, will be irreparably harmed because, without the Pandemic Voting Safety Measures in place, there is a substantial likelihood that absentee mail ballot applications will not be processed in a fair, timely and accurate manner and absentee mail ballots will not be processed in a fair, timely manner.  In addition, regardless of the method by which the individual Plaintiffs end up voting, they will be irreparably harmed if, because the Pandemic Voting Safety Measures are not in place, other Georgia voters are disenfranchised.

150.

Plaintiffs Throop and Wasson, along with other Coalition Members, are residents of DeKalb County and have a great interest in the county sheriff's race on the March Ballot and the June Ballot.  Similarly, Plaintiffs Martin, Nakamura,

Throop, and Wasson, along with other Coalition members, are residents of the City

of Atlanta which is conducting a referendum on sales tax that appears on the

March Ballot and the June Ballot.  If some voters' March Ballots are wrongfully

cancelled when they submit an application for, but do not return, a June Ballot,

these Plaintiffs will be irreparably harmed because the result of the vote for the

county sheriff and the City referendum will not be accurate.

## COUNT I: FUNDAMENTAL RIGHT TO VOTE

## 42 U.S.C. § 1983

### Violation of State Law - Infringement of the Fundamental Right to Vote in Violation of the Fourteenth Amendment's Guarantee of Due Process

151.

Plaintiffs incorporate and reallege Paragraphs 1 through 150.

152.

Inherent in an individual's fundamental right to vote is the right to vote

without endangering their own or others' safety.  This is a fundamental right of

individuals protected by the United States Constitution and incorporated against

the State by the Due Process Clause of the Fourteenth Amendment.

153.

By holding elections during the COVID-19 pandemic without taking actions to protect voters' safety, including the Pandemic Voting Safety Measures described above in Parts V, VI, VII and VIII,  Defendants will knowingly burden severely and infringe upon the fundamental right to vote of the Member Plaintiffs and Coalition's members and will injure Coalition by causing it to divert resources and personnel form other ongoing projects.

154.

These severe burdens and infringements caused by Defendant's actions and inaction, and failure to take the Pandemic Voting Safety Measures, are not outweighed or justified by, and are not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less burdensome means.

155.

In violating Plaintiffs' constitutional rights, Defendants are acting under color of state law.

156.

The threatened injury to Plaintiffs' rights is irreparable and imminent, and

Plaintiffs have no adequate remedy at law.  Plaintiffs are accordingly entitled to an

injunction requiring Defendants to take the Pandemic Voting Safety Measures.

## COUNT II: EQUAL PROTECTION

## 42 U.S.C. § 1983

### Claim for Relief from Threatened Violations of the Fourteenth Amendment's
### Guarantee of Equal Protection

*(Seeking Prospective Injunctive Relief*
*Against Defendants in their Official Capacities)*

157.

Plaintiffs incorporate and reallege Paragraphs 1 through 150.

158.

Defendant Raffensperger has set Election Day for June 9, 2020, and intends

to require Georgia's county election superintendents to conduct, and Georgia's

voters (including individual Plaintiffs and other individual voters who are members

of Plaintiff Coalition) to participate in, certain required election activities in

accordance with the statutory election calendar that results from Defendant Raffensperger's selection of June 9, 2020, for Election Day.

159.

Defendant Raffensperger intends to require county election superintendents and voters to conduct and participate in their required election activities without himself instituting reasonable measures that will mitigate voters' risks of exposure to COVID-19, to the extent reasonably possible.

160.

Defendant Raffensperger's intended adherence to his selected Election Day of June 9, 2020, as well as his intention not to institute reasonable mitigation measures, will foreseeably cause certain identifiable groups of Georgia voters to be treated differently than other, similarly situated voters in the same election. Specifically:

- Elderly voters who vote in-person on Election Day using BMDs will be exposed to a much higher chance of dying from COVID-19 contracted during the in-person voting process than will younger in-person voters.

- Voters who have certain underlying health conditions that are known to be aggravating co-morbidities for COVID-19 who vote in-person on Election Day using BMDs will be exposed to a much higher chance of dying from COVID-19 contracted during the in-person voting process than will voters who do not have such health conditions.

- Elderly voters and voters with health conditions who seek to avoid the severe health risks of in-person voting by opting to vote by mail, by contrast, will be exposed to a realistic likelihood that they will cast a less effective vote than in-person voters because of the substantial risks that either  (i) mail ballot applications will not be timely processed and no ballot will be received, (ii) mailed ballots will be misdirected, misdelivered, or delayed beyond the permissible period for ballots to be received due to overload of the postal system during the current pandemic, or (iii) mailed ballots will be erroneously rejected by election officials without the voter being afforded an adequate opportunity to timely cure the rejection.

- Voters who prefer to vote in-person but who are forced to cast a ballot by mail in order to safeguard their health will be differentially burdened, relative to in-person voters, because Georgia's procedures for voting by mail require voters to complete and submit a mail-ballot application in advance of Election Day and then to mail the completed ballot or deliver it in-person.  Both of these steps are inherently burdensome even without taking into account that they will require some voters to leave home at least once during the pendency of physical distancing advisories in order to reach public mailing or voting facilities.

161.

Defendant Raffensperger's intention to engage in conduct that will foreseeably subject similarly situated voters to unequal health risks, solely in order to adhere to an Election Day set for June 9, 2020, is arbitrary and capricious because a later Election Day would permit an orderly election to be held while also exposing discrete groups of vulnerable voters to less severe health risks.

162.

Defendant Raffensperger's intention to engage in conduct that will foreseeably subject similarly situated voters to unequal health risks is fundamentally unfair because voters should not be required to jeopardize their health in order to exercise their fundamental right to participate in self-government.

163.

Defendant Raffensperger's intention to engage in conduct that will foreseeably subject similarly situated voters to unequal health risks differentially imposes a profound burden upon the fundamental right to vote, federal constitutional rights to freedom of speech and association, and Georgia constitutional right to vote.  These unequal burdens arising from Defendant Raffensperger's intended conduct will foreseeably lead to a suppression of the votes cast by members of the affected groups of voters because individual voters can reliably be presumed to favor the preservation of their own individual health and safety over their desire to exercise the franchise in this single upcoming election.

164.

One or more of (i) the individual Plaintiffs or (ii) other individual Georgia voters who are members of Plaintiff Coalition is among the identifiable groups of elderly and health-vulnerable voters that will be differentially subjected to health risks as a result of Defendant Raffensperger's intended conduct.

165.

Defendant Raffensperger's threatened conduct is neither justified by a legitimate governmental interest nor properly tailored to serve such an interest.

166.

Defendant Raffensperger's threatened conduct will violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

167.

Defendant Raffensperger's threatened conduct will violate the unconstitutional-conditions doctrine by forcing certain affected voters to suffer deprivation of their constitutional right to equal protection as a condition of being able to exercise their fundamental constitutional right to vote.

168.

Defendant Raffensperger will commit the foregoing violations in the course of acting under color of state law.

169.

If an injunction does not issue against Defendant Raffensperger's intended conduct, Plaintiffs (and Coalition's Georgia-based members) will suffer the violation of their constitutional right to equal protection and other irreparable injuries for which there is no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.  Issue an order directing Defendants to undertake all of the Pandemic Voting Safety Measures immediately;

2.  Issue any declaratory relief necessary for the effectiveness of the injunctive relief requested;

3.  Retain jurisdiction to ensure Defendants' ongoing compliance with the Orders entered by the Court in this case;

4.  Grant Plaintiffs their reasonable attorney's fees, costs, and expenses incurred in this action pursuant to 42 U.S.C. § 1988; and

5. Grant Plaintiffs such other relief as the Court deems just and proper.

This 20th day of April, 2020.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Pro Hac Vice Pending
ROBERT MCGUIRE LAW FIRM
113 Cherry St. #86685
Seattle, Washington 98104-2205
(253) 267-8530

*Attorneys for Plaintiffs*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Complaint has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
Attorney for Plaintiffs
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

EXHIBIT

A

# Coalition for Good Governance

March 23, 2020

The Honorable Brad Raffensperger
Georgia Secretary of State
214 State Capitol
Atlanta, Georgia 30334

Via email Brad@sos.ga.gov

Re: **Recommendations for 2020 Elections**

Dear Secretary Raffensperger:

The Coalition for Good Governance (CGG) proposes the following urgent actions that you and the Georgia State Election Board ("SEB") can take to ensure the security and integrity of, and broad voter participation in, the 2020 elections in view of the coronavirus threat. Though CGG is an adversary to your office and the SEB in litigation challenging the constitutionality of Georgia's Dominion Voting System, *Curling v. Raffensperger*, No. 1:17-cv-02989-AT (N.D. Ga. filed Aug. 8, 2017), we submit the following requests and recommendations to you not as litigation adversaries, but as interested members of the voting public. We hope that you and the SEB will consider these suggestions with open minds in order to serve our shared interest of protecting millions of Georgians.

We are happy to discuss any of these requests and recommendations at your convenience.

## A. Count All March 24 Mail Ballots

We understand that counties have been instructed not to count March 24 election mail ballots received after March 24, although the official election date has been moved to May 19. Voters may not desire to request another ballot to vote in the more complex May 19 primary. For example, a DeKalb County voter may wish to vote only on the March 24/May 19 sheriff's race and now may still have an unvoted mail ballot. The voter should not be required to apply for a new ballot when he or she has an unvoted ballot for the sheriff's race that is now moved to May 19. Please reconsider the decision not to count such ballots that arrive after March 24 and, instead, count all ballots arriving on or before May 19, the new official Election Day to avoid voter confusion, disenfranchisement and excessive paperwork for administrators.

## B. BMDs—An Unsafe System for the Foreseeable Future

The Dominion Ballot Marking Device system is unsafe from a public health perspective while the coronavirus threat continues to ravage Georgia communities.

Georgia statutes require that a voting system be "safe and practicable" ***prior to deployment.*** O.C.G.A. § 21-2-300(a)(2). The Secretary of State is required to make a determination of whether the voting system can be used "safely and accurately." O.C.G.A. § 21-2-379.24(b). Upon re-examination, the Secretary's determination can change as to its ability to be used in safe operation by electors. O.C.G.A. § 21-2-379.24(c).

The Dominion BMD system cannot be used safely during the COVID-19 pandemic. The system requires intense and labor-intensive Logic & Accuracy Testing in the election office, followed by the labor-intensive steps of transporting system components to polling places. The systems then must be installed in the polling places, which also involves concentrated team contact, considerable equipment handling, and extensive staff presence in the polling places. The system's components (including touchscreens, PollPads, styluses, and smart cards) all require significant and repeated physical touching and handling by both voters and workers, as well as considerable team interaction (for operation, instruction, and assistance) between poll workers and voters. All supplies and components of the system must be cleaned to the CDC's exacting specification after every individual voter's use in the current environment. This health and safety requirement cannot be met given the delays that such steps would impose on voters in the polling places and the widespread labor and cleaning supply shortages. Further, Dominion recommends that the touchscreens be powered down for cleaning, which would cause a long delay for rebooting after every voter and massively increase the risk of system failure.

A far simpler, more health-conscious solution would be to replace the BMDs with hand marked paper ballots, which could be delivered in a single box to each polling place. Disposable pens or golf pencils (for 2020 only) could be used to mark ballots. Minimal handling of equipment would occur if officials were to use "central count" options for hand marked paper ballots as referenced by O.C.G.A § 21-2-485, a process in which voters could cast their paper ballots into a "dumb" precinct ballot box for centralized scanning at the elections office. This alternative would involve fewer personnel and less handling, as well as permitting voters to spend less time in the polling place.

Many thousands of labor hours would be saved by using hand marked paper ballots instead of BMDs, which would relieve pressure to staff the large number of posts currently anticipated to be necessary at a time when labor will be difficult to find.

**For the foregoing reasons, we urge you to decertify the BMD components of the Dominion Voting System for use in the immediately upcoming 2020 elections because the system is _unsafe_ under the circumstances that will likely prevail at the time these elections are conducted.**

We believe that combined with flexible mail ballot and early voting options permitted by state law, hand marked paper ballots can provide the basis for an orderly and safe election in May, July, and November if diligent hygiene is maintained with lean crews. We offer a number of suggestions below that would facilitate the use of hand marked paper ballots to conduct these and any other elections that will be held during the remainder of the current national public health emergency.

1. If officials are concerned about the accuracy of hand marked ballot style issuance in early voting because of the number of potential ballot styles, they should conduct a simple manual check with a sign-off by the poll worker "checker." This simple manual effort would save hundreds of hours and avoid the risks that will otherwise be imposed by the need to set up and use BMDs for automated ballot issuance.

2. Voters should not be required either to sign or to use styluses to touch PollPads. (Nor should voters including voters with disabilities requiring assistive BMD technology be required to handle smart cards.) Either signatures should be waived this year, or else paper pollbooks should be used, since these can be signed with disposable golf pencils or disposable pens.

3. Voters should be permitted (but not required) to bring their own printed-at-home, signed polling place applications to vote, thereby reducing human interactions and time spent in the polling place.

4. Given the potential for disruptions of online services and the foreseeable difficulties of locating technical help promptly in such an event, the SEB should require election superintendents to use a paper pollbook backup of elector information that has been updated to reflect all early voting (i.e., the "certified electors list" in O.C.G.A. § 21-2-401(b)). The paper backup should be used to adjudicate discrepancies, and voters eligible to vote according to the paper backup list should not be forced to vote a provisional ballot.

## C. Voting Method Expansion and Alternatives

1. Permit acceptance of mail ballots at early voting locations and home precinct on election day. The State Election Board ("SEB") is aware of CGG's proposals (in partnership with the Georgia Libertarian Party and Georgia Constitution Party as well as others) submitted November 22, 2019, for voters to be permitted to drop off mail ballots to be **accepted** for later counting after showing identification in

the polling places in order to avoid subjecting themselves to mailing and signature-rejection risks. These proposals should be adopted.

Additionally, for ballots received without identification (such as when a person delivers a family member's ballot), polling locations could be used as drop-off (not approval/verification) locations. We urge the SEB to quickly adopt a mandatory rule consistent with current law permitting the appointment of absentee ballot at expanded locations. *See* O.C.G.A. § 21-2-382.

Accept completed mail ballots at curbside. Early voting centers, precinct polling places, central offices, and temporary pop-up drive-through locations should be established to ***accept and approve*** mail ballots. A drive-through drop-off could be set up in each polling place's parking lot and could be staffed until late evening. Poll workers could use iPad-like tablets with absentee ballot lists to check off ballots as returned after reviewing the photo identifications of the voters. Absentee ballot clerks should be appointed at each of these stations under O.C.G.A. § 21-2-382.

2. Curbside voting. Many states effectively use curbside voting, which permits eligible voters to receive paper ballots in their cars, vote on a clipboard, and return the ballot in a secrecy sleeve to the poll worker. Georgia should make use of similar methods. Disposable cardboard sheets could be used instead of clipboards. Sleeved ballots could be dropped into a locked ballot box without poll workers handling the ballots.

3. Drive-through window voting at banks. Banks should be asked to participate by permitting their drive-through windows to be used as ballot acceptance stations on election day. Ballots can be issued to or collected from such facilities if proper controls are put into place.

4. Early voting hours. In Georgia's generous three-week period of early voting, differing hours (not necessarily more hours) should be offered, with at least some locations offering hours that extend until late evening on certain days, in order to help reduce the sizes and densities of polling place crowds during the day.

5. Polling place locations. For purposes of the May and July elections, polling places should be temporarily moved to nearby (closed) schools so that large gymnasiums and cafeterias can be used for in-person voting. Larger spaces mean more room to spread out equipment, voting stations, poll workers, and voters— all of which help people comply with the CDC's social distancing recommendations.

6. Facilitating mail balloting.

    a. The SEB should require all counties to accept online email or faxed absentee ballot applications, with a required short issuance period.

b. All voters should have the option to submit a one-time request for mail ballots that would cover all 2020 elections and related 2021 runoffs.

c. Current mail ballot application forms should be updated and simplified to explain methods of submitting the applications and clarify which voters are eligible to apply for multiple elections in one request.

d. Federal Write-In Absentee Ballots should be accepted as a fail-safe voting method if the voter has not obtained a mail ballot in time for mailing or casting (for 2020 only).

e. Establish pop-up absentee ballot clerk locations (i.e., "additional sites" under O.C.G.A. § 21-2-382) in precinct polling places and government buildings in order to *issue mail ballots in person*. Ballots could be taken home to be completed and subsequently returned by mail or in-person delivery.

f. Announce that there will be no enforcement of prohibition of voting mail absentee ballot on election day. (O.C.G.A. §21-2-385(a)) Many voters like to vote on election day and personally deliver their mail ballots. Some counties are recently warning voters not to vote their mail ballots on election day.

7. Mail Ballot Processing.

Certain changes to mail ballot processing will be warranted to effectuate the above proposals while also preserving secrecy of the ballot and minimizing any risks of voter disfranchisement.

a. Clear instructions must be printed on mail ballot inside secrecy envelopes to explain the purpose of the envelope, its mandatory use, and requirement of ballot secrecy.

b. Your office should emphasize that county election officials must comply strictly with mail ballot protocols for secrecy. CGG's poll watchers have observed voter privacy being compromised by election officials in small communities during the opening and processing of mail ballots.

c. Voters should be permitted to enclose a black and white *copy* of their photo identification to substitute for signature verification checks and thereby to avoid the rejection-and-cure process. (Enclosing identification must be accomplished in a manner that protects ballot secrecy and provides for redaction of personally identifying information afterward.)

d. Mail ballot acceptances and rejections should be required to be posted by all counties daily, as most counties do routinely. Third parties require this information to help voters track ballots and cure discrepancies.

## D. Mail Ballot Security

Certain additional security measures will be required in order to effectuate the above proposals. We recommend the following steps.

1. Create strict prohibitions against ballot harvesting. Mail ballot coercion, fraud, and vote buying are all exacerbated if community groups, labor unions, religious organizations, etc., are permitted to collect ballots. The SEB should enact clear rules prohibiting such harvesting, including punitive fines.

2. Adopt strict and transparent chain of custody documentation. In order to have public confidence in the election, the poll workers, poll watchers, and the parties they represent must be able to verify the chain of custody of mail ballots and their supporting documents. Clear rules should be promulgated by the SEB to ensure that such documents are mandatory, that there is certainty of compliance, and that poll watchers are afforded the ability to independently verify chain of custody for mail ballots and accompanying documentation.

## E. Transparency

Given the massive changes to voting methods that will be required in order to avoid exacerbating the public health threat posed by SARS-Cov-2 and COVID-19 (whether or not you and the SEB adopt any of the above recommendations), increased transparency measures—especially in mail balloting—are going to be essential to preempt doubts about the integrity of the upcoming elections. Accordingly, we offer the following additional suggestions that are aimed at ensuring voter confidence in this difficult period.

1. Poll watcher access to mail ballot operations. County officials should be instructed that all operations and processes of mail ballot issuance, acceptance, rejection, scanning, and tabulation should be open to visual access and verification by authorized poll watchers. An appropriate number of poll watchers should be permitted, in order to allow for rotation of poll watchers over the expanse of days and hours in which election operations occur.

2. Poll watcher review of ballot issuance or voter rejection. State law and ballot issuance practices should be amended to permit authorized poll watchers to verify the accuracy of ballot styles issued to the voter to reduce errors in ballot issuance or the rejection of the voter from voting in the polling location. Verification of accuracy can be conducted with reference to an electronic record in the possession of the poll watcher, such as via an iPad. Permitting poll watchers to conduct such a check should not impede the voting process in any way. Conducting such checks is a routine function of poll watchers in other jurisdictions. These checks help to minimize, if not avoid, instances of

unintentional disfranchisement of voters, inappropriate provisional balloting, and inaccurate ballot style issuance.

3. <u>Political Parties/Bodies Working Group</u>. We recommend that all political parties and registered political bodies be asked to join a working group to meet weekly (by virtual means) with you, preferably in a publicly broadcast meeting, to facilitate the exchange of information and ideas through the conclusion of the 2020 elections and runoffs in January 2021. This mechanism would provide a transparent vehicle for you to use to ensure that you may conduct any necessary ongoing problem-solving with the input of civic entities capable of speaking for a broad and hopefully representative cross-section of all Georgia voters. The political parties, in particular, could play a helpful public role, if they were involved in such a working group, by facilitating the widespread communication to the public and candidates of accurate information about ongoing decision making.

The above suggestions are a partial list of changes that we urge all Georgia officials to consider, given the grave public health risk facing Georgia at this moment and given the ever-present need to facilitate safe and secure voting. The Dominion BMD Voting System is particularly ill-suited to the current situation because it adds unnecessary risks and financial costs to a fragile election environment. Given Dominion's failures to comply with the terms of the contract with respect to compliance with federal and state election laws, including secret ballot laws, we urge you to consider requiring that Dominion refund the cost of the BMD touchscreen components, which would likely generate a refund to the State of $65 to $75 Million.

We are happy to discuss this with you at your earliest convenience.

Respectfully,

Marilyn Marks
Executive Director
Coalition for Good Governance
Marilyn@USCGG.org
704 292 9802

cc:
State Election Board Members
Vice-Chair Rebecca Sullivan Rebecca.sullivan@doas.ga.gov
Ahn Le ale@lelawllc.com
David Worley david@ewlllc.com
Matthew Mashburn mmashburn@georgia-elections.com

Staff:
Germany, Ryan rgermany@sos.ga.gov
GA Secretary of State Elections Division jshannon@sos.ga.gov

EXHIBIT

B

April 6, 2020


The Honorable Brad Raffensperger
Georgia Secretary of State
214 State Capitol
Atlanta, GA 30334
(via email)

Re: Request for reexamination of certain voting system components


Dear Secretary Raffensperger:

The COVID-19 public health crisis demands that certain high-touch components of the Dominion voting system be reevaluated for their implications for public safety, given the number of plastic and metal surfaces that must be handled multiple times by voters, poll workers, and support staff. The reexamination should be conducted with primary input from infectious disease experts and public health experts. Therefore, pursuant to O.C.G.A. § 21-2-379.24, the undersigned electors of the State of Georgia, and organizations representing thousands of other electors, hereby request an immediate reexamination of certain components of the Dominion Voting System (EAC Certification Number DVS-DemSuite5.5-A) ("Dominion System"), specifically the Ballot Marking Device Version 5.5.10.30, and the Knowink PollPad system.

Specific components of present concern:

--PollPad electronic pollbook units, including the stylus;
--Voter access smart cards; and
--Ballot marking devices' touchscreens.

The attached Exhibit A is a graphic developed to demonstrate the risk of the virus spreading on voter-touched surfaces. By contrast, paper pollbooks, voter applications, hand marked paper ballots, and disposable pens can greatly reduce the number of potentially contaminated surfaces that workers and voters must touch.

We ask that recognized infectious disease experts and public health experts lead in conducting the reexamination of the components and that the following facts be considered:

> --Paper alternatives are readily available and do not require a comparable level of staff, vendor, and voter handling or human interaction. Poll workers can issue paper ballots in envelopes or paper sleeves from behind plexiglass shields.

> --Use of the BMD components (touchscreens, printers, battery backups) adds approximately 80,000 unnecessary pieces of equipment to test, transport, install,

clean, secure, maintain, and return to inventory after the election.

--In addition, use of the BMD components requires handling at least 100,000 plastic smart cards intended for reuse by voters and staff.

--Touchscreen use requires thousands of precious hours of staff and technician programming and testing, requiring teamwork in close quarters. Hand marked paper ballots do not require this labor-intensive work.

--Dominion recommends that BMD touchscreens be shut down for cleaning, which will greatly increase voter wait times in crowded polling places if touchscreens are cleaned—as they should be—between every use. Poll worker shortages will reduce the ability to ensure that thorough cleaning is consistently performed.

--Transporting 80,000 additional components to polling places adds to handling inside trucks and polling places. Installation of these 80,000 integrated but unnecessary components in the polling place also requires considerable human interaction in tight spaces.

--Touchscreens must be placed in locations near electric receptacles, which causes the voting stations to be placed close together. Paper ballot voting stations can be placed farther from each other.

--Touchscreens cannot be used for safer voting methods like curbside voting, while paper ballots can easily be used in many such approaches.

The above considerations are certainly not all of the facts that should be taken into consideration in the reexamination of the unsafe components.

We enclose at least the statutory minimum ten (10) signatures of duly registered Georgia electors who seek this reexamination. The undersigned voters hereby state that, given the current public health crisis, certain components of the Dominion System fail to meet the statutory requirement that the voting system devices are ***safe*** for use by Georgia electors (O.C.G.A. 379-2-379.24 (b) and (c)). Additionally, the BMD touchscreens and PollPad units fail to comply with the statutory requirement that the components be "***safely transportable***." (O.C.G.A. 21-2-379.22 (10).

We the undersigned do not agree to pay the published reexamination fee for the needed reexamination. We believe that any costs for this reexamination should be minimal and are necessary expenditures of the Secretary's office. This is a matter of urgent public health importance and merits your immediate action. We reiterate our request that the evaluation be conducted primarily by infectious disease experts and public health experts.

Please let us know of you have questions concerning our request.

Respectfully submitted,

Cam Ashling, Chair
Georgia Advancing Progress PAC
(as an individual and on behalf of the organization)
Atlanta, GA 31126
gappacinc@gmail.com
404-759-1782


Marilyn Marks
Executive Director
Coalition for Good Governance
(on behalf of its Georgia members)
Marilyn@USCGG.org
704-292-9802

Ryan Graham, Chair
Libertarian Party of Georgia
(as an individual and on behalf of the organization)
Ryan.Graham@lpgeorgia.com

Ricardo Davis, Chair
Constitution Party of Georgia
(as an individual and on behalf of the organization)
ricardodavis@gaconstitutionparty.org

Ryan Barrett, Chair
Newton County Democratic Committee
(as an individual and on behalf of the organization)
barrettdrga@gmail.com

Jeanne Dufort,
1st Vice Chair, Morgan County Democratic Committee
(as an individual and on behalf of the organization)
jdufort@aol.com
Madison, GA

Rutledge Forney, MD
Atlanta, GA

Allen L. Dollar, MD, FACC, FACP
Emory Chief of Cardiology, Grady Memorial Hospital

Associate Professor of Medicine
Division of Cardiology
Emory University of School of Medicine

Corey Greenwald, MD
Atlanta, GA

Christy Blanchford, MD
Covington, GA

Karl Woodworth
Emory University Medical Librarian (retired)
Newborn, GA

Chris Hodges
Councilwoman, Madison GA

Shea Roberts
Candidate for Georgia House District 52
Sandy Springs, GA

Marvin Lim
Candidate for Georgia House District 99
Norcross, GA

Priscilla G. Smith
Candidate for Georgia House District 34
Kennesaw, GA

Linda Woodworth
Chair, Newborn Area Heritage Association
Newborn, GA

Elizabeth Throop
Atlanta, GA

Joy Wasson
Atlanta, GA

Rhonda J. Martin
Atlanta, GA

Aileen Nakamura
Sandy Springs, GA

Isabel, Fernando, Sophia, and Lucia Gambino
Atlanta, GA

Megan Missett
Atlanta, GA

Kathryn Grant
Valdosta, GA

Linda Kaminski
Canton, GA

Cissy Hanemayer
Madison, GA

Aaron Ruscetta
Decatur, GA

Cc:
Kathleen Toomey, Commissioner of Public Health

State Election Board Members
Rebecca Sullivan
Ahn Le
T Matthew Mashburn
David Worley


Attn: Ryan Germany
rgermany@sos.ga.gov

Kevin Rayburn
krayburn@sos.ga.gov

# SAFE VOTING DURING THE COVID-19 PANDEMIC

## APRIL 2020



## DR. JOIA MUKHERJEE
## MARK RITCHIE
## RON FEIN
## SUSAN GREENHALGH
## COURTNEY HOSTETLER

### A REPORT BY FREE SPEECH FOR PEOPLE

www.freespeechforpeople.org

Safe Voting During the COVID-19 Pandemic

## Introduction

The SARS-CoV-2 coronavirus ("novel coronavirus"), which causes the Coronavirus Disease 2019 ("COVID-19"), has been spreading throughout the United States since approximately January 2020. There is currently no cure or vaccine for COVID-19. As of this writing, there are more than 360,000 reported cases of COVID-19 in the United States, with cases in all fifty states, the District of Columbia, and U.S. territories. More than 10,000 people in the United States have died from COVID-19. Unfortunately, both of these numbers are expected to increase dramatically over the next several months. On March 29, 2020, Dr. Anthony Fauci, the director of the National Institute of Allergy and Infectious Diseases, predicted that millions of Americans would be infected and 100,000-200,000 would die.[1]

As the novel coronavirus spirals out of control, it has become clear that our traditional Election Day practices are not suited for a pandemic. In response, some states have already begun to postpone primary elections. But elections—the foundation of our democracy—must be held, and we must make legal and policy changes now to ensure a safe, accessible, and trustworthy election in November.

This report summarizes best practices for safe voting in the 2020 elections, based on the generally accepted best practices for infectious disease control (including for the novel coronavirus in particular) as of this date.[2] As explained in more detail below, we recommend that every state and jurisdiction take the following actions:

- **Make vote-by-mail easy.** All voters should have the opportunity to vote by mail, or to complete their ballots at home and drop them off at a drive-through or walk-through drop-off location. The processing of mail-in ballots must be handled in a way that protects poll workers from virus transmission.

---

[1] Susan Milligan, "Fauci: U.S. Coronavirus Deaths Could Near 200,000," https://www.usnews.com/news/national-news/articles/2020-03-29/anthony-fauci-us-coronavirus-deaths-could-near-200-000 (Mar. 29, 2020).

[2] The information in this report reflects best practices as of this writing. As knowledge of this virus is rapidly evolving, it is likely that, over time, this understanding will evolve.

1

Safe Voting During the COVID-19 Pandemic

- **Minimize person-to-person contact at polling places.** Early voting should be expanded as much as feasible, to help limit the number of people who must vote on any one day, and the number of polling places should be increased. Voters should not be required to wait in long lines to vote. Polling places should be configured to allow at least six feet of distance between all voters and poll workers.
- **Minimize contact with commonly-used surfaces.** Polling places should be designed to ensure that voters are not required to touch common surfaces that are not disinfected. All voting-related equipment must be cleaned and disinfected regularly. Paper ballots are safer than voting machines and less likely to spread the novel coronavirus because fewer people must handle each ballot. The use of voting machines should be absolutely minimized, and used by only those voters who require them for accessibility purposes.
- **Design and manage polling places to protect the most vulnerable populations.** The location and staffing of polling sites should be carefully arranged to protect the most vulnerable populations, including older adults.

## Epidemiology of the novel coronavirus

The novel coronavirus is thought to spread mostly person-to-person through respiratory droplets produced by an infected person who sneezes or coughs within approximately a six-foot radius of another person or who touches and object that is then touched by another person.

However, the novel coronavirus can also be spread through surfaces or objects. If the novel coronavirus is present on a surface or object, a person may contract COVID-19 by touching that surface or object, and then touching their mouth, nose, or eyes. Other coronaviruses, including Severe Acute Respiratory Syndrome (SARS) coronavirus and the Middle East Respiratory Syndrome (MERS) coronavirus, have been found to persist on glass for 4-5 days, and to persist on plastic for up to 6 days, with one coronavirus strand surviving on plastic for up to 9 days.[3] An early study on the aerosol and surface stability of the novel

---

[3] G. Kampf et al., "Persistence of Coronaviruses on Inanimate Surfaces and Their Inactivation With Biocidal Agents," 104 J. of Hospital Infection 246 (Mar. 2020), https://doi.org/10.1016/j.jhin.2020.01.022.

Safe Voting During the COVID-19 Pandemic

coronavirus has determined that the novel coronavirus can remain viable on plastic for up to 3 days.[4]

In both cases, individuals infected with the novel coronavirus can shed the virus while appearing asymptomatic.

## The novel coronavirus and the voting process

While voting practices vary widely, many aspects of common voting processes in the United States pose a high risk of transmitting the novel coronavirus. Because individuals can spread the novel coronavirus through person-to-person contact, any dense grouping of people might result in person-to-person spread of COVID-19.

At many polling places, voters waiting to vote must stand in line with other voters, often indoors and in confined spaces, sometimes for extended periods of time. Once inside the polling location, the typical "flow" involves interacting with a poll worker to check in; proceeding to a semi-private voting booth or area that may be quite close to another voter's voting booth; and then interacting with another poll worker to check out. All of these offer opportunities for an infected voter or poll worker to transmit the novel coronavirus directly to others.

Additionally, the novel coronavirus may be shed onto voting machines, voting booths, and other materials required for voting. The novel coronavirus could remain present on those materials for hours or days unless they are properly sanitized using disinfectants that are approved by the CDC for rendering the virus inactive.

## Infectious disease control best practices for elections

The best practices to control the spread of the novel coronavirus in the voting process are based on the following principles:

> a. Minimizing person-to-person contact via social distancing.

---

[4] Neeltje van Doremalen et al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared With SARS-CoV-1," Letter to the Editor, New England Journal of Medicine (Mar. 17, 2020), https://bit.ly/2Uibd28.

3

Safe Voting During the COVID-19 Pandemic

      b.  Minimizing contact by multiple people with commonly used
           surfaces.

      c.  Frequently disinfecting commonly used surfaces.

      d.  Protecting the most vulnerable populations, including older
           adults.

The Centers for Disease Control and Prevention ("CDC") issues and updates guidance on mass gatherings and large community events.[5] As of this writing, the CDC recommends that all U.S. events of 10+ people should be cancelled or held virtually. Many states and cities have imposed similar or even more stringent measures. Government authorities may revise these measures over time for various reasons. But from the perspective of infectious disease control, expert medical consensus is unlikely to change its view that minimizing large gatherings will be essential for months to come.

The CDC also issues and updates guidance specific to election polling locations.[6] The following best practices and recommendations are drawn from and reflect CDC and other expert medical guidance, as well as the professional expertise and judgment of Free Speech For People's advisor on infectious disease control in the voting process, Dr. Joia Mukherjee.

## Voting by mail

**All voters should have the opportunity to vote by mail, or to complete their ballots at home and drop them off at a drive-through or walk-through dropoff location.** Voters should be able to request mail-in ballots up to the day before the election, to increase the likelihood that individuals who are diagnosed with COVID-19 or have been exposed to the novel coronavirus do not vote in person, and to ensure that individuals who wish to reduce their exposure to infection can do so. Envelope closures for mail-in ballots should use "no-lick" sealing methods such as pressure-sensitive gum.

---

[5] *See* CDC, "Interim Guidance: Get Your Mass Gatherings or Large Community Events Ready for Coronavirus Disease 2019 (COVID-19)," https://www.cdc.gov/coronavirus/2019-ncov/downloads/Mass-Gatherings-Document_FINAL.pdf (revised Mar. 29, 2020).

[6] *See* CDC, "Recommendations for Election Polling Locations," https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (revised Mar. 27, 2020).

Safe Voting During the COVID-19 Pandemic

**Secure remote ballot marking options should be offered for voters with disabilities.** Voters with disabilities may not be able to mark a vote-by-mail ballot at home. Jurisdictions should offer remote accessible ballot marking systems that allow a voter to access a ballot electronically on her computer or device and use assistive technology to mark and print a paper ballot. These systems should always conform to recommendations from the National Institute of Standards and Technology to protect ballot privacy and security and not transmit any vote selection information over the Internet.[7]

**The processing of mail-in ballots must be handled in a way that protects poll workers from virus transmission.** Processing locations must be set up to ensure that poll workers maintain a distance of six feet from one another. Poll workers should be provided with protective equipment, and be able to practice hand hygiene frequently in accordance with CDC guidance.[8] Envelopes should be opened in a manner that does not require poll workers to touch the envelopes' adhesive. Finally, tabulation equipment must be routinely sanitized in accordance with the vendor's guidance.

## In-person voting

It may be impossible or not preferable for some voters to vote by mail. Therefore, all efforts must be made to ensure that voting locations are as safe and sanitary as possible.

### *Minimizing person-to-person contact at polling places*

Density of people at polling sites must be reduced. This involves several measures to spread voters out in both space and time.

**Early voting should be expanded as much as feasible, to help limit the number of people who must vote on any one day, and the number of polling places should be increased.** On Election Day itself, voting hours should be expanded, and voters should be encouraged to come during off-peak hours when

---

[7] Computer Sec. Res. Ctr., Nat'l Inst. of Sci. & Tech., "Security Best Practices for the Electronic Transmission of Election Materials for UOCAVA Voters" (NISTIR 7711), https://nvlpubs.nist.gov/nistpubs/Legacy/IR/nistir7711.pdf (Sept. 2011).

[8] *See* CDC, "When and How to Wash Your Hands," https://www.cdc.gov/handwashing/when-how-handwashing.html (last visited Apr. 6, 2020).

Safe Voting During the COVID-19 Pandemic

possible. Where possible, "curbside voting" (in which voters can vote without leaving their vehicles) should be made available, especially for voters with disabilities or who may be ill. Election officials should increase the number of available polling places, to ensure that fewer individuals are required to visit each polling location.

**Voters should not be required to wait in long lines to vote.** If short lines must form, voters must be able to maintain 6 feet of separation between one another. Voters should not be turned away at the polls to avoid long lines. Instead, long lines should be avoided by taking precautions recommended above, including expanded vote-by-mail, early voting options, and increasing the number of polling places to avoid dense crowds, as well as expanding the simultaneous voting capacity at polling places.

**Polling places should be configured to allow at least six feet of distance between all voters and poll workers**. In particular, voting booths must be configured to place at least 6 feet of separation between voters. The voting process should be set up to require only minimal interaction between voter and poll worker. Finally, voters and poll workers should be discouraged from bringing non-essential visitors such as minor children or grandchildren with them to the polls.

### *Minimizing contact with commonly used surfaces*

**Polling places should be designed to ensure that voters are not required to touch common surfaces that are not disinfected.** Poll workers should wear surgical gloves and masks while handling ballots, pens, and other voting equipment. Poll workers should change their gloves and masks and wash their hands regularly.

Polling locations should provide alcohol-based hand sanitizer (at least 60% alcohol) for use both before and after voting. Sanitizer should be placed near the entrance, at registration desks, near the exits, and at other visible, frequently used locations. If possible, polling places should be located near publicly accessible bathrooms, which should be frequently re-stocked with ample soap and disposable paper towels.

Safe Voting During the COVID-19 Pandemic

**All voting-related equipment must be cleaned and disinfected regularly.** CDC guidance advises that poll workers must "[c]lean and disinfect voting-associated equipment (e.g., voting machines, laptops, tablets, keyboards) routinely."[9] However, the CDC does not define "routinely." From a public health standpoint, the best practices are as follows:

- For any equipment that is used repeatedly but by only one individual (e.g., a poll book that is used by only one poll worker for an entire shift), disinfect at least once per hour.
- For any equipment that is directly touched by multiple voters or other individuals (e.g., voting machines or assistive technology), disinfect after each individual's use.

**Paper ballots are safer than voting machines and less likely to spread the novel coronavirus because fewer people must handle each ballot.** Where possible, voters should be given their own disposable pen to mark the ballot and their own disposable writing surface. If not possible, each pen and writing surface must be thoroughly disinfected after each use.

Unfortunately, most voting machines are difficult to clean or sanitize properly in the middle of an election. The U.S. Election Assistance Commission has collected and published manufacturers' recommended practices for cleaning some electronic voting machines.[10] They are difficult to properly clean, in many cases require specialized instruction or materials, and have small parts.

Several manufacturers warn that common disinfectants, or departing from the recommended cleaning technique, could damage the equipment. For example, Election Systems & Software ("ES&S") warns that poll workers must be careful to not touch the sensors on the edges of the screen, "scratch touch screens," or

---

[9] *See* CDC, "Recommendations for Election Polling Locations," https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (revised Mar. 27, 2020).
[10] *See* Election Assistance Comm'n, "Coronavirus (COVID-19) Resources," https://www.eac.gov/election-officials/coronavirus-covid-19-resources (last visited Apr. 6, 2020).

7

Safe Voting During the COVID-19 Pandemic

allow moisture to "linger[] on the external surface."[11] ES&S also warns poll workers not to apply cleanser directly to the screens, or to use too much cleaner on the cloth, or else the equipment may become "damaged during cleaning."[12] As another example, Dominion Voting lists just six approved branded cleaning products for its touchscreen-based voting machines.[13]

In normal times, these products might all be readily available, but in the current situation, election officials might be unable to obtain them in sufficient quantities. They would then face the dilemma of either inadequately disinfecting the voting machines (which could then become disease vectors) or using unapproved products, possibly damaging expensive and hard-to-replace equipment in the middle of an election.

In many cases, manufacturers' recommended cleaning guidelines—which may be reasonable in normal circumstances—are inconsistent with the twin public health mandates of frequent cleaning and avoiding buildup of long lines during a pandemic. For example, Dominion Voting warns that its touchscreen-based voting machines must be powered down before cleaning, noting that "[m]oist wipes may alter the touch sensitivity of screens until the moisture is removed. Additionally, some screen buttons may be inadvertently activated during wipe down."[14] Powering down a voting machine before cleaning, and then restarting it after cleaning, takes time, especially because many machines will require a special administrator login after rebooting. Similarly, MicroVote cautions that after cleaning its Infinity electronic voting machine, poll workers must "[a]llow

---

[11] ES&S, "Best Practices – Voting System," at 1-2, https://www.eac.gov/sites/default/files/electionofficials/coronavirus/ESS_BestPractices_Cleaning_Disinfecting.pdf (last visited Apr. 6, 2020).

[12] *Id.* at 3.

[13] Dominion Voting, "Customer Notification: COVID-19 ('Coronavirus') Information," at 4 (Mar. 9, 2020), https://www.eac.gov/sites/default/files/electionofficials/coronavirus/DVS_CoronavirusCleaningNotice_030920.pdf.

[14] Dominion Voting, "Customer Notification: COVID-19 ('Coronavirus') Information," at 1 (Mar. 9, 2020), https://www.eac.gov/sites/default/files/electionofficials/coronavirus/DVS_CoronavirusCleaningNotice_030920.pdf.

Safe Voting During the COVID-19 Pandemic

ample drying time after cleaning before operation."[15] If sanitized after each voter's use, consistent with infectious disease control best practices, these cleaning practices could lead to long lines that may create an increased risk of person-to-person transmission.

Furthermore, manufacturers' recommended cleaning practices are often highly specific, with cautions regarding any deviations. ES&S, for example, specifies that a "trained poll worker" must clean the machines.[16] Poll workers, whether paid or volunteer, are generally only lightly trained (e.g., a single two-hour training) and it is unreasonable to expect flawless execution.

This could result in two distinct failure modes. First, a poll worker might fail to clean a voting machine adequately, rendering it a continued potential source of surface-to-voter transmission. Second, a poll worker might inadvertently deviate from the cleaning instructions and damage a machine. This will reduce polling place capacity and thus lead to longer lines, creating an increased risk of person-to-person transmission.

**Consequently, the use of voting machines should be absolutely minimized, and used by only those voters who require them for accessibility purposes.** The machines will still have to be sanitized according to manufacturer and health authority instructions after every voter's use, but by minimizing the number of voters who use these voting machines, this will be much less often than if most or all voters were required to use them.

There is a collateral public health benefit to reducing the usage of these voting machines. In many cases, polling places can physically accommodate more voters voting simultaneously on paper ballots than on voting machines, with less (or no) down-time due to equipment failures. This would enable a faster flow through the polling place, thus reducing time spent in lines and exposed to other voters.

---

[15] MicroVote, "Cleaning and Disinfecting Infinity Voting Equipment," https://www.eac.gov/sites/default/files/electionofficials/coronavirus/MicroVote_CleanSanitize.pdf (last visited Apr. 6, 2020).
[16] ES&S, "Best Practices – Voting System," at 1, https://www.eac.gov/sites/default/files/electionofficials/coronavirus/ESS_BestPractices_Cleaning_Disinfecting.pdf (last visited Apr. 6, 2020).

Safe Voting During the COVID-19 Pandemic

## *Protecting the most vulnerable populations*

**The location and staffing of polling sites should be designed and managed to protect the most vulnerable populations.** Polling sites should be relocated away from senior centers or residential facilities. Election officials should recruit extra poll workers to facilitate a more expeditious voting process and to account for potential absences due to sickness or prudent self-isolation. There is expected to be a large pool of recently-unemployed workers, many of whom are in lower-risk groups for serious infection, who could be recruited for this important civic task. Poll workers who are at higher risk of serious infection should be given opportunities to serve in areas that do not involve engaging directly with voters, such as processing vote-by-mail ballots.

## Conclusion

This year is the first federal election since 1918, and the nation's first-ever presidential election, conducted during a major global pandemic. In the midst of such a pandemic, we must have a president, governors, and mayors who have the consent of the governed. That requires a free, fair, and safe election. The recommendations in this report reflect best practices for ensuring a safe, accessible, and trustworthy election. Election officials should begin implementing these recommendations now, and continue to consult with public health experts to devise plans that limit transmission of the novel coronavirus without interfering with voters' ability to cast their votes. Our democracy demands no less.

Safe Voting During the COVID-19 Pandemic

## About the Authors

Dr. Joia Mukherjee is a physician, clinical researcher, and educator trained in Infectious Disease, Internal Medicine, Pediatrics, and public health at the Massachusetts General Hospital and the Harvard School of Public Health. She is an Associate Professor of Medicine at the Brigham and Women's Hospital in the Division of Global Health Equity and in the Department of Global Health and Social Medicine at Harvard Medical School. She founded and directs the Masters in Medical Science in Global Health Delivery at Harvard Medical School. Dr. Mukherjee mentors residents in the Global Health Equity program at the Brigham and Women's Hospital and fellows from Children's Hospital and other Harvard teaching hospitals.  She teaches infectious disease, global health delivery, and human rights to health professionals and students from around the world. She is the author of *Introduction to Global Health Delivery: Practice, Equity, Human Rights*, a textbook published in 2017 by Oxford University Press. Dr. Mukherjee's academic scholarship focuses on the treatment of HIV, TB, mental health and the strengthing of health systems in impoverished settings.  She is also a sought-after teacher in human rights. Since 2000, Dr. Mukherjee has served as the Chief Medical Officer of Partners In Health, an international medical charity with programs in the United States, Haiti, Rwanda, Lesotho, Malawi, Sierra Leone, Liberia, Peru, Mexico, Russia, Kazakhstan and the Navajo nation.  As Chief Medical Officer of PIH, Joia coordinates and supports PIH's efforts to provide high quality, comprehensive health care to the poorest and most vulnerable. She advises various grassroots organizations throughout the world and has consulted for the World Health Organization and other international agencies on health systems strengthening, human resources for health, the treatment of HIV, and the treatment of drug resistant tuberculosis in impoverished settings. She has won numerous awards for her teaching and health delivery work, and holds four honorary degrees. She is a graduate of the University of Minnesota Medical School and also earned a Masters of Public Health from the Harvard School of Public Health. Dr. Mukherjee is a member of the Free Speech For People Board of Directors.

Mark Ritchie served as Minnesota's Secretary of State from 2007-2015, including a term as president of the National Association of Secretaries of State. He currently serves on the U.S. Election Assistance Commission's Board of Advisors, appointed by Senator Amy Klobuchar. His time as Secretary of State was characterized by efforts to enhance voter knowledge and participation and the

Safe Voting During the COVID-19 Pandemic

expansion of a wide range of services for Minnesota businesses, organizations, and residents. He graduated with a B.S. from Iowa State University and a master's degree in Public Affairs from the University of Minnesota-Twin Cities.

Ron Fein is the Legal Director for Free Speech For People. Mr. Fein previously served as Assistant Regional Counsel in the United States Environmental Protection Agency's New England office, where he received the EPA's National Gold Medal for Exceptional Service. Earlier, Mr. Fein clerked for the Honorable Kermit Lipez of the United States Court of Appeals for the First Circuit and the Honorable Douglas Woodlock of the United States District Court for the District of Massachusetts. He graduated Order of the Coif from Stanford Law School and *summa cum laude* from Harvard College.

Susan Greenhalgh is the Senior Advisor on Election Security for Free Speech For People. Ms. Greenhalgh has previously served as vice president of programs at Verified Voting and at the National Election Defense Coalition, advocating for secure election protocols, paper ballot voting systems and post-election audits. Recognized as an expert on election security, she has been an invited speaker at meetings of the MITRE Corporation, the National Conference of State Legislatures, the Mid-West Election Officials Conference, the International Association of Government Officials, the Election Verification Network and the E-Vote-ID conference in Bregenz, Austria. She is a frequent source for reporters from *The New York Times, The Washington Post, The Wall Street Journal, Politico, USAToday, Associated Press, National Public Radio* and other leading news outlets. She has appeared on CNN and MSNBC's *The Rachel Maddow Show,* and various other television news shows. She has a B.A. in Chemistry from the University of Vermont.

Courtney Hostetler is the Counsel for Free Speech For People. Previously, Ms. Hostetler served as staff attorney for South Coastal Counties Legal Services, where she helped low-income clients recover damages for wage theft and employment discrimination, and obtained special education services for traumatized children. Ms. Hostetler also worked at Zalkind Duncan & Bernstein LLC and ACLU Massachusetts, where she focused on eliminating discriminatory discipline practices in public schools. Prior to attending law school, Ms. Hostetler managed the Close Up Foundation's national youth voting program and worked as a research analyst for the Genocide Intervention Network. Ms. Hostetler

clerked for the Honorable James L. Dennis of the United States Courts of Appeals for the Fifth Circuit. Ms. Hostetler graduated with a J.D. from Yale Law School, an M.Phil from Oxford University, and a B.A. from Colgate University.

### About Free Speech For People

Free Speech For People works to renew our democracy and our United States Constitution for we the people. Founded on the day of the Supreme Court's *Citizens United* ruling, Free Speech For People envisions a democratic process in which all people have an equal voice and an equal vote. We fight for free and fair elections, for reliable and secure voting systems, and for the bedrock principle that, in a democracy, all voters must have their votes properly counted. To learn more, please visit our website: www.freespeechforpeople.org.

13

EXHIBIT

C



Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

All A-Z Topics

Search    Coronavirus ▾   🔍

## Coronavirus Disease 2019 (COVID-19)

CDC › Coronavirus Disease 2019 (COVID-19) › Communities, Schools & Workplaces › Gatherings & Community Events

🏠 Coronavirus Disease 2019 (COVID-19)

- Symptoms & Testing
- Prevent Getting Sick
- Daily Life & Coping
- **If You Are Sick**
- People Who Need Extra Precautions
- Frequently Asked Questions
- Travel
- Cases, Data, & Surveillance
- **Communities, Schools & Workplaces**
  - Critical Workers
  - Disinfecting Your Facility
  - Disinfect Your Non-Emergency Vehicle
  - Schools & Child Care
  - Colleges & Universities
  - Businesses
  - **Gatherings & Community Events**
    - Interim Guidance for Event Planners
    - **Election Polling Locations**
    - FAQs for Event
  - First Responders and Law Enforcement
  - Community- and Faith-Based Organizations
  - Parks & Recreational Facilities
  - Homeless Population
  - Retirement Communities
  - Correctional and Detention Facilities
  - Tribal Communities
- Healthcare Professionals
- Health Departments
- Laboratories
- Communication Resources



✉ **Get Email Updates**

To receive email updates about COVID-19, enter your email address:

[Email Address]

What's this?   Submit

**Spanish Communication Resources**



Social Media Toolkit

Learn More

# Recommendations for Election Polling Locations

Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)

Other Languages ▾    Print Page

**Updated March 27, 2020**

> **Summary of changes:**
> - Encourage moving election polling locations away from long term care facilities and facilities housing older persons to minimize COVID-19 exposure among older individuals and those with chronic medical conditions.
> - Updated EPA COVID Disinfectant Link.

## Background

There is much to learn about the novel coronavirus (SARS-CoV-2) that causes coronavirus disease 2019 (COVID-19). Based on what is currently known about SARS-CoV-2 and about similar coronaviruses, spread from person-to-person happens most frequently among close contacts (within about 6 feet). This type of transmission occurs via respiratory droplets. Transmission of SARS-CoV-2 to persons from surfaces contaminated with the virus has not been documented. Transmission of coronavirus in general occurs much more commonly through respiratory droplets than through contact with contaminated surfaces. Current evidence suggests that SARS-CoV-2 may remain viable for hours to days on surfaces made from a variety of materials. Cleaning of visibly dirty surfaces followed by disinfection is a best practice measure for the prevention of COVID-19 and other viral respiratory illnesses in election polling locations.

## Purpose

This guidance provides recommendations on the routine cleaning and disinfection of polling location areas and associated voting equipment (e.g., pens, voting machines, computers). It suggests actions that polling station workers can take to reduce the risk of exposure to COVID-19 by limiting the survival of the virus in the environment. This guidance will be updated if additional information becomes available.

Definitions:

- *Community settings* (e.g. polling locations, households, schools, daycares, businesses) encompass most non-healthcare settings and are visited by the general public.
- *Cleaning* refers to the removal of dirt and impurities including germs from surfaces. Cleaning alone does not kill germs. But by removing them, it decreases the number of germs and therefore any risk of spreading infection.
- *Disinfecting* kills germs on surfaces. Disinfecting works by using chemicals to kill germs on surfaces. This process does not necessarily clean dirty surfaces or remove germs. But killing germs remaining on a surface after cleaning further reduce any risk of spreading infection.

### Actions for elections officials in advance of election day

- **Encourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations.**
  - Encourage mail-in methods of voting if allowed in the jurisdiction.
  - Encourage early voting, where voter crowds may be smaller throughout the day. This minimizes the number of individuals a voter may come in contact with.
  - Encourage drive-up voting for eligible voters if allowed in the jurisdiction.
  - Encourage voters planning to vote in-person on election day to arrive at off-peak times. For example, if voter crowds are lighter mid-morning, advertise that in advance to the community.
  - Encourage relocating polling places from nursing homes, long-term care facilities, and senior living residences, to minimize COVID-19 exposure among older individuals and those with chronic medical conditions.
  - Consider additional social distancing and other measures to protect these individuals during voting.

### Preventive actions polling workers can take

- **Stay at home if you have fever, respiratory symptoms, or believe you are sick.**
- **Practice hand hygiene frequently:** wash hands often with soap and water for at least 20 seconds. If soap and water are not readily available, use an alcohol-based hand sanitizer that contains at least 60% alcohol.
- **Practice routine cleaning of frequently touched surfaces:** including tables, doorknobs, light switches, handles, desks, toilets, faucets, sinks, etc.
- **Disinfect surfaces that may be contaminated with germs after cleaning:** A list of products with EPA-approved emerging viral pathogens claims ⧉ is available. Products with EPA-approved emerging viral pathogens claims are expected to be effective against the virus that causes COVID-19 based on data for harder to kill viruses. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, use of personal protective equipment).
- **Clean and disinfect voting-associated equipment (e.g., voting machines, laptops, tablets, keyboards) routinely.** Follow the manufacturer's instructions for all cleaning and disinfection products.
  - Consult with the voting machine manufacturer for guidance on appropriate disinfection products for voting machines and associated electronics.
  - Consider use of wipeable covers for electronics.
  - If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to clean voting machine buttons and touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

### Preventive action polling stations workers can take for themselves and the general public

Based on available data, the most important measures to prevent transmission of viruses in crowded public areas include careful and consistent cleaning of one's hands. Therefore:

- **Ensure bathrooms at the polling station are stocked adequately with soap, water, and drying materials** so visitors and staff can wash their hands..
- **Provide an alcohol-based hand sanitizer with at least 60% alcohol** for use before or after using the voting machine or the final step in the voting process. Consider placing the alcohol-based hand sanitizer in visible, frequently used locations such as registration desks and exits.
- **Incorporate social distancing strategies, as feasible.** Social distancing strategies increase the space between individuals and decrease the frequency of contact among individuals to reduce the risk of spreading a disease. Keeping individuals at least 6 feet apart is ideal based on what is known about COVID-19. If this is not feasible, efforts should be made to keep individuals as far apart as is practical. Feasibility of strategies will depend on the space available in the polling station and the number of voters who arrive at one time. Polling station workers can:
  - Increase distance between voting booths.
  - Limit nonessential visitors. For example, poll workers should be encouraged not to bring children, grandchildren, etc. with them as they work the polls.
  - Remind voters upon arrival to try to leave space between themselves and others. Encourage voters to stay 6 feet apart if feasible. Polling places may provide signs to help voters and workers remember this.
  - Discourage voters and workers from greeting others with physical contact (e.g., handshakes). Include this reminder on signs about social distancing.

### Recommendations for processing mail-in ballots

- Workers handling mail in ballots should practice hand hygiene frequently
- No additional precautions are recommended for storage of ballots

## References

- Community Mitigation Guidance for COVID-19 Response in the United States: Nonpharmaceutical Interventions for Community Preparedness and Outbreak Response
- Handwashing: Clean Hands Save Lives
- Protect Yourself & Your Family

Top of Page

Page last reviewed: March 10, 2020

Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

HAVE QUESTIONS?
- Visit CDC-INFO
- Call 800-232-4636
- Email CDC-INFO
- Open 24/7

CDC INFORMATION
About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

CONNECT WITH CDC
f y 📷 in
🔗 🎬 🔊 ✉

U.S. Department of Health & Human Services     USA.gov     CDC Website Exit Disclaimer ⧉




EXHIBIT

D

**Cobb County Government**
Thursday at 4:13 PM · 🌐

There is a great need from Cobb County Elections to provide all of our wonderful Election Workers with masks. The Elections Office needs a total of 1,400 before the June 9 election to help protect poll workers. Starting Monday, May 4, the elections office, located at 736 Whitlock Ave., Marietta, will have a donation bin at its entrance from noon to 1 p.m., Monday-Friday. Please put the donated masks in a plastic bag and place them in the bin.



EXHIBIT

E

## COVID-19 IMPACT SURVEY

County: _Lee_                                         Date: _April 4, 2020_

| Questions | Advance Voting | Election Day |
|---|---|---|
| How many poll workers did you plan to have before virus? | 5 | 65 |
| How many poll workers do you currently have available accounting for loss due to virus? | 2 | 35 |
| Do you expect to lose additional poll workers between now and advance voting/election day? (Y/N) | Y | Y |
| Have you been able to add additional poll workers to account for the ones you have lost? (Y/N) | N | N |
| Do you have a way to sufficiently train supplemental poll workers given social distancing/shelter at home requirements currently in place? (Y/N) What are your limitations? (List limitations below) | N | N |
| How many polling places do you normally have/expected to have before virus? | 1 | 10 |
| How many polling places do you expect to be able to open now? | ? | ? |
| How many regular office employees were you planning on having available to work before Virus? | 2 | 2 |
| How many regular office employees are you able to have work now? | 1 | 1 |
| How many temporary office workers (not poll workers) were you planning on needing before virus? | 1 | 2 |
| How many temporary office workers (not poll workers) were you planning on needing now accounting for the expected increase in absentee by mail voting in the upcoming election? | 4 | |
| How many temporary office workers do you currently have accounting for loss due to virus? | 2 | 1 |
| Have you been able to supplement the loss of any temporary workers with other temporary workers? (Y/N) | N | N |
| Will you have enough people and facilities to have L&A Testing? (Y/N) | Y | |
| Will you have access to people to transport/set up/recover voting equipment? (Y/N) | Y | |

Additional Challenges:
Things change down here Quick. Currently
I use 6 county Bldgs. for precincts & 4 churches.
Our County Commission does not want us to
use county Bldgs. for the election unless the
crisis is over.

E

X

H

I

B

I

T


F

## RESOLUTION ENCOURAGING STATE LEADERS TO ALLOW VOTING EXCLUSIVELY BY MAIL IN THE UPCOMING MAY ELECTION

Whereas elections for the postponed Presidential Preference Primary, as well as non-partisan elections and party primaries, are rapidly approaching; and

Whereas all registered voters have a right to vote guaranteed by the Georgia Constitution[1]; and

Whereas the Coronavirus (aka COVID-19) has been rapidly spreading throughout Georgia, the United States, and the world[2];

Whereas Georgia residents are under a Shelter in Place order imposed by Governor Kemp through April 30th, 2020[3]; and

Whereas Georgia public schools have been physically closed for the remainder of the 2019-2020 school year, limiting students to on-line instruction only[4]; and

Whereas, the Coronavirus appears to be easily spread from person to person[5]; and

Whereas, scientists are proposing that an absolute minimum distance of six feet apart be maintained between persons to prevent spread of the virus[6]; and

Whereas, despite the best preparations for a live, in-person vote, the six-foot rule and adequate sanitation cannot be maintained; and

---

[1] Article II, Section I, Paragraph II of the Constitution of Georgia of 1983.

[2] https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6

[3] https://www.ajc.com/blog/politics/breaking-kemp-extends-shelter-place-order-georgia-through-april/TsMutJJldcp9FTb3QTD00J/

[4] https://www.ajc.com/news/state--regional-education/schools-closed-until-fall/r7QgK2idaQ0681UafbW3XP/

[5] https://www.livescience.com/covid19-coronavirus-transmission-through-speech.html

[6] https://www.livescience.com/coronavirus-six-feet-enough-social-distancing.html

Whereas, the average age of a poll worker in Georgia is 70 years old[7]; and

Whereas, the Centers for Disease Control advises that older adults are at higher risk of developing complications from the virus, including death[8]; and

Whereas, fearing for their own safety, roughly half of Jackson County's trained poll workers have withdrawn from participating in the upcoming election; and

Whereas, the Georgia constitution provides that the State Government shall protect the citizens of this State[9]; and

Whereas, the Board of Elections and Registration of Jackson County wants to protect all citizens (including poll workers, elections office staff, custodians, EMTs, sheriff's deputies, all of their families, and everyone involved in the voting process) while ensuring the right to vote; and

Whereas, the continual moving of election dates creates a financial burden on taxpayers through their county and state taxes; and

Whereas, the Georgia Secretary of State has mailed an absentee voter request form to every registered voter in the State of Georgia[10]; and

Whereas, every voter may request an absentee ballot for mail-in voting by returning the request via fax, mail, e-mail, or in-person[11]; and

Whereas, local voter registration offices keep track of the request being made, the ballot being sent, and the ballot being returned, thus providing accountability to the voter that his or her vote is received and counted; and

---

[7] https://www.gpbnews.org/post/could-coronavirus-affect-georgia-s-elections

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

[9] Article I, Section I, Paragraphs II and VII of the Constitution of Georgia of 1983.

[10] https://www.ajc.com/news/state--regional-govt--politics/voters-mailed-absentee-ballot-request-forms-for-may-georgia-primary/hc0FkOo85uVCALbWvQUo9L/

[11] https://sos.ga.gov/index.php/Elections/absentee_voting_in_georgia

Whereas, voting by mail in the current COVID-19 pandemic is the only guaranteed method to protect voters, poll workers, and others involved in the voting process;

**NOW, therefore, be it resolved that the Board of Elections and Registration of Jackson County, for the safety and wellbeing of the citizens of Jackson County and of Georgia, hereby urge Governor Brian Kemp, Lt. Governor Geoff Duncan, House Speaker David Ralston, and Secretary of State Brad Raffensperger to provide that the upcoming election be conducted entirely by mail.**

SO AUTHORIZED AND RESOLVED this 8th day of April, 2020.


_____          _____
Eric C. Crawford                          Theressa Tate
Chairman                                  Member


_____          _____
Erma Denney                               Judy McNichols
Member                                    Member

EXHIBIT

G



Voters faced long lines, confusion and risk of infection as Wisconsin's elections, including presidential primaries, took place in spite of the coronavirus pandemic.    Lauren Justice for The New York Times

E

X

H

I

B

I

T

H



E

X

H

I

B

I

T

I



EXHIBIT

J

